STATE

v.

Keith WERNER.

No. 94–745–C.A.

Supreme Court of Rhode Island.

June 5, 2003.

See also, 615 A.2d 1010.

Jane M. McSoley/Aaron L. Weisman, for Plaintiff.

Paula Rosin/Susan B. Iannitelli/Christoph S. Gontarz, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, J., and WEISBERGER, C.J. (Ret.).

## OPINION

WEISBERGER, Chief Justice (Ret.).

This case comes before us on appeal by Keith Werner (defendant or Werner) from a judgment of conviction entered in the Superior Court on a criminal information, which charged the defendant with six felony counts. Count 1 charged the defendant with assault with intent to murder Loran Stoddard; count 2 charged the defendant with assault with intent to murder Frank Burton; count 3 charged the defendant with assault with a dangerous weapon upon Michael McGonigle; count 4 charged the defendant with possession of a loaded weapon in a vehicle; count 5 charged the defendant with possession of a sawed-off shotgun; and count 6 charged the defendant with possession of a firearm after having been previously convicted of a crime of violence.

Five counts were tried in the Superior Court by a justice sitting with a jury in the County of Kent beginning on May 24, 1994. Count 6 had been severed before trial. At the completion of the trial on June 8, 1994, the jury returned verdicts finding Werner guilty of assault with a dangerous weapon (lesser-included offense) on counts 1 and 2. The jury found defendant guilty on counts 3, 4, and 5. Thereafter, the trial justice denied defendant's motion for a new trial and, on August 4, 1994, sentenced defendant to ten years imprisonment on the three counts of assault with a dangerous weapon (sentences to run concurrently). He sentenced defendant to serve ten years imprisonment on count 4, possession of a loaded weapon in a vehicle, and to serve five years of imprisonment on count 5, possession of a sawed-off shotgun. These latter sentences

were to be served concurrently with each other but consecutive to the sentences imposed on the first three counts. All the sentences were to be served consecutively to prison sentences imposed in the Commonwealth of Massachusetts and to sentences previously imposed in Rhode Island. The defendant filed a timely appeal from this judgment. We deny and dismiss defendant's appeal. The facts and procedural history of this case insofar as pertinent to this appeal are as follows.

### Facts and Procedural History

On the early morning of May 15, 1988, Michael McGonigle (McGonigle), the manager of Johnny Ray's Beef & Brew (Johnny Ray's or bar) on Crawford Street in West Warwick, stopped at the bar to check on his sister, who was working for the first time as a bartender at the establishment. After a short stay at the bar, he left the premises and encountered a man who drove up to the bar in a silver-blue Ford vehicle, which looked to him "like [a] Grenada or something." McGonigle and the driver had a somewhat heated exchange, after which the man started to pull a black, sawed-off shotgun from a heavy green garbage bag lying on the front passenger seat and pointed it out the car window at McGonigle. Thereupon, McGonigle ran back toward the bar and, on his way, noted that the driver was standing in the street, struggling to take the bag off the gun. When he arrived inside the bar, McGonigle told his sister to call the police.

Loran Stoddard (Stoddard), who lived in an apartment above the bar, had gone down to the bar at about 11:30 p.m. Stoddard, who had been drinking heavily, heard the argument between McGonigle and the driver of the vehicle. When Stoddard attempted to end the argument, the driver (whom he later identified as Keith Werner) told him to mind his own busi-

ness. When Stoddard did not comply, defendant walked back to his car, reached in through the driver's door, and took out a large garbage bag from which he extracted a shotgun. He pointed the barrel at Stoddard and fired. Stoddard was struck in both knees and fell to the ground. As he pointed the gun, Werner admonished the victim: "[m]aybe this will teach you to mind your own business."

Frank Burton (Burton) arrived at Johnny Ray's establishment at approximately 10:30 p.m. on May 14, 1988. At about 12 midnight, Burton heard McGonigle shouting that there was a man outside armed with a shotgun. Upon entering the bar, McGonigle had closed the door leaving Stoddard outside with the purported wielder of the gun. Burton peeked out the door and observed the gunman aiming a shotgun at Stoddard. Burton closed the door and listened. When silence indicated that the gunman might have left, Burton reopened the door and heard the gunman yell, "I'll blow your head off." The gunman fired, and some of the pellets ricocheted from the sidewalk and struck Burton in his arm and legs while he was still in the doorway. He noted Stoddard lying in the road with apparently serious wounds on the lower portions of his legs and in his knees.

Shortly afterward, a West Warwick patrolman, Mark Amaral, arrived and observed Stoddard lying in the gutter outside the bar. He saw Burton standing over Stoddard. Burton also was wounded. McGonigle told the officer that the assailant was a white male in his late twenties with sandy blonde hair, worn "pushed up but no part." The officer was told that the gunman drove a gray Ford Grenada with Rhode Island license plates numbered IF–536.

Messrs. Burton and Stoddard were taken to the Kent County Hospital, where Burton was treated and released the same day. Stoddard was required to undergo emergency surgery to remove pellets and to repair damage to his knees. He underwent significant surgical procedures and remained in the hospital for eighteen days. He also was treated for pain after he was discharged.

On the evening of May 15, 1988, West Warwick detectives visited Stoddard at the Kent County Hospital. He had undergone surgery earlier that day. Nevertheless, he did speak with them and viewed a photo array from which he selected a picture of Werner as the man who had shot him.

Shortly after Officer Amaral arrived, Sergeant Peter Appollonio (Sgt.Appollonio) of the West Warwick police arrived at Johnny Ray's. He was informed that the assailant was a white male approximately six feet tall with dirty blonde hair combed straight back from his forehead. He was also informed that the assailant drove away in a vehicle described by witnesses at the scene to be either a 1978 or 1979 gray Ford Grenada or Mercury Monarch with Rhode Island license plates numbered IF–536. About ten minutes later, another West Warwick police officer, Danielle Maynard, radioed to Sgt. Appollonio that she had located the described vehicle parked on St. John Street, within one-half mile of Johnny Ray's. Upon arriving at the location of the automobile, Sgt. Appollonio ascertained that the vehicle was empty. He then directed other officers to search the neighborhood to find out whether the suspect was hiding nearby. Sergeant Appollonio tried the door of the automobile and found it to be unlocked. Inside the car, he discovered a Rhode Island registration certificate listing the owner of a 1976 blue Plymouth Fury as one Dennina Prefontaine with an address at Davisville, Rhode Island. He also found a bill of sale from one Diane Levy to Ms. Prefontaine

that described the subject vehicle as a 1979 gray and black Mercury Monarch. This was the specific vehicle that Sgt. Appollonio had found. He also found a receipt for repairs that listed Ms. Prefontaine as the owner of the vehicle that he had discovered. Also in this vehicle, Sgt. Appollonio found billing notices for two magazine subscriptions, both addressed to Werner at 200 Lockwood Street, West Warwick. After seizing these items of evidence from the Mercury Monarch, Sgt. Appollonio returned to the bar, picked up McGonigle, and brought him to the Mercury Monarch. McGonigle identified the vehicle as the one that had been driven by the shooter earlier that night. The car then was towed to the West Warwick police station. Thereafter, the car was removed to a wrecking company and was destroyed after eight days, when it had not been claimed by a purported owner.

After returning to the station, Sgt. Appollonio attempted to trace the suspect by using the documents he had procured from the Mercury Monarch. He was unable to obtain an address for Ms. Prefontaine. Consequently, he went to 200 Lockwood Street, which was the address noted on the magazine subscriptions. He arrived at this address between 3 and 4 a.m. and encountered a woman who identified herself as Cynthia Mackabee (Ms. Mackabee). Ms. Mackabee said that she was Werner's sister. She described her brother as slightly over six-feet tall, approximately thirty years of age, with dirty blonde hair. Ms. Mackabee said that Werner lived with Ms. Prefontaine, and described her as his girlfriend. Ms. Mackabee was not certain of the exact address but she told the sergeant that she believed her brother lived in the vicinity of Brookside Avenue in West Warwick.

When Sgt. Appollonio returned to the West Warwick police station, he checked with the traffic division of the department as soon as it opened. After checking the names of Werner and Prefontaine for traffic violations, he discovered that Werner had listed an address as 14B Brookside Avenue with the Administrative Adjudication Court. He learned that this was an apartment building in the town of West Warwick. It was later discovered that Ms. Prefontaine had begun a dating relationship with Werner during the year 1987. In the course of this relationship, he moved into her apartment at 14B Brookside Avenue. At some point during the month of May 1988, the relationship had deteriorated between the couple and Werner began spending part of his time in another apartment in the same building, as well as residing part of the time in Apartment 14B.

Ms. Prefontaine disclosed later at trial that she and Werner both used a silver and red Mercury Monarch (which she sometimes referred to as a Ford Grenada). This vehicle was not registered with the Division of Motor Vehicles, but it did bear a Rhode Island license plate numbered IF–536. This plate was officially assigned to a 1976 blue Plymouth Fury that Ms. Prefontaine also owned. The registration certificate for the Plymouth was kept inside the Monarch. She also agreed that she had taken the Monarch to Roger's Automotive Services for repair sometime before the shooting occurred. She also later disclosed that she and Werner had argued on the evening of May 14, 1988. At the end of the argument, Werner told her that he was going to return to New York (where he had previously resided). He took the keys to the Monarch and left. On the morning of May 15, 1988, Sgt. Appollonio went to 14 Brookside Avenue. He was accompanied by other officers, whom he deployed around the building. The officers banged on the front door of the apartment building and announced

their presence. Ms. Prefontaine appeared at the window and was ordered to come outside. She was accompanied by Norman Ducharme (Ducharme) whom she had met the night before at Ronny's Last Chance Saloon, after Werner had left. Ducharme had accompanied her back to her apartment about 2 a.m. Upon emerging from the building, both Ms. Prefontaine and Ducharme were arrested.

Meanwhile, at the rear of the building, Detective James Santos (Det.Santos) saw Werner open a window and lean out as though he intended to climb out of the building. Detective Santos yelled "Halt Police." At this point, Werner ducked back inside the building and appeared shortly thereafter at the front door. He was ordered outside by Sgt. Appollonio. As he emerged from the building, Werner was handcuffed and taken into custody.

The West Warwick police, several hours later, sought and obtained a search warrant authorizing the search of Apartment 14B in the Brookside Avenue complex. The main door of the apartment building led into a hallway. Apartment 14B was to the right of the hallway; a vacant apartment numbered 14A was straight ahead. Several detectives who participated in the search testified at the trial. They described Apartment 14B as fully furnished, with appliances, furniture, and a television set. Detective Santos seized photographs of Werner holding a shotgun. These photographs were on the refrigerator in the apartment. Other detectives seized a shotgun shell box containing one shotgun shell; six more shotgun shells—five live and one spent—were found under the couch, along with a shotgun cleaning kit. Detective O'Connell entered the vacant apartment, the door to which was partially open. From the door, he was able to see a large green plastic bag similar to that described by the witnesses to the shooting.

The detective theorized that the drop ceiling in the kitchen might be a suitable hiding place for a weapon. He removed one of the ceiling tiles and saw a Mossberg pump-action shotgun. Later Det. Norman Frenette of the West Warwick Bureau of Criminal Identification processed the gun for fingerprints. He was unable to achieve a match because of the poor quality of the single, partial print that he was able to remove. At the trial, Commander Gerald Gorman of the West Warwick police testified that he was a firearms expert and had examined the shotgun. He testified that the weapon had been altered significantly to have homemade features. He concluded that the shotgun was the same firearm as that which Werner held in the photographs seized from Apartment 14B. He also expressed the opinion that no other guns identical to the gun seized in the vacant apartment by Det. O'Connell existed anywhere. McGonigle also positively identified the weapon as the one that had been pointed at him outside Johnny Ray's just before the shooting. Another witness, whose name was Kenneth Gammon, also testified at the trial and, with some reluctance, identified the weapon as one that he had seen in Werner's apartment on May 14, 1988.

To support his appeal, defendant has raised eight issues and numerous subissues. These issues will be considered in the order of their significance to this opinion. Further facts will be supplied as may be necessary to deal with these issues.

## I

### The Motion to Dismiss Pursuant to an Alleged Violation of the Interstate Agreement on Detainers Act

▮ It is undisputed that Rhode Island is a signatory to the Interstate Agreement on Detainers Act (IADA or act) which has been codified as G.L.1956 chapter 13 of

title 13. This act constitutes a compact among a number of participating states, including the Commonwealth of Massachusetts. It has been approved by Congress and is designed to expedite the trial of criminal charges pending in one state (the receiving state) while the person is incarcerated in another state (the sending state). The purpose of this compact has been outlined in *United States v. Mauro*, 436 U.S. 340, 343–44, 98 S.Ct. 1834, 1839, 56 L.Ed.2d 329, 336 (1978). We have recognized that the purpose of this act is "encouraging and facilitating the expeditious disposition of charges pending against that prisoner in another jurisdiction." *State v. Clifton*, 777 A.2d 1272, 1279 (R.I.2001). We also held in *Clifton* that we employ a *de novo* standard in reviewing the denial of a defendant's motion to dismiss a charge under the IADA. *Id.* However, we review with deference the findings of historical fact upon which the trial justice's legal determination is based. These factual findings will be disturbed only if clearly wrong. *Id.*

■ The defendant was arraigned on the charges contained in this information in 1988. Between the date of his arraignment and November 1989, four attorneys were appointed to represent him and subsequently were discharged by Werner. Pretrial hearings on this information began before a justice of the Superior Court on September 15, 1988. At that time, Werner was represented by Attorney Richard Corley. The defendant told the justice that he wished to dismiss Attorney Corley and obtain new counsel because he was dissatisfied with Corley's representation. Over the objection of counsel for the state, the justice granted defendant's request. When Werner came before another justice of the Superior Court in December 1988, he again complained about counsel; but strangely enough, Attorney Corley was still representing Werner when he was presented before the first justice in April 1990, on a motion to suppress evidence found in the search of the Mercury Monarch that Werner drove on the night of the shooting. Attorney Corley was successful on this motion and the justice granted the motion to suppress the fruits of the search of the automobile. On appeal to this Court, the order suppressing the evidence was reversed in *State v. Werner*, 615 A.2d 1010 (R.I.1992).

While the appeal from the order of suppression was pending, Werner was incarcerated in the Suffolk County jail in Massachusetts. He was released on bail in December 1991, but did not surrender to the Rhode Island authorities. He was again arrested in Massachusetts, on a charge of home invasion, in March 1992. He was incarcerated awaiting trial in Suffolk County, Massachusetts, at the time that this Court released its opinion in *State v. Werner*. After Werner was sentenced by a Massachusetts court in March 1993, the Rhode Island office of the Attorney General began attempts to seek custody of Werner pursuant to the IADA to face a number of criminal charges that were pending in this state. The history of these attempts is complex and subject to considerable dispute between the parties. It appears that during these attempts Mr. Werner at times worked at cross-purposes with the attorneys who represented him.

He appeared before a justice of the Superior Court on December 6, 1993, at which time the justice held that Rhode Island had sought temporary custody of defendant pursuant to Article III of the IADA rather than Article IV, which had been cited by counsel for defendant. The Court made the following findings of fact intermingled with conclusions of law:

"The detainer in this case is dated April 1, 1993. The State has represent-

ed to the Court that that detainer was mailed on April 8, '93 and received on April 12, '93, by the Commonwealth of Massachusetts. This representation is further supported by the fact that a copy of that letter was received by the Superior Court and date-stamped by the Clerk's Office April 12, 1993. The Court finds that the receipt of the detainer triggers the running of a 30 day period during which the sending state, that is Massachusetts, through its Governor, may object to the offer of temporary custody, or the prisoner himself may object to the offer of temporary custody, but that once the detainer is lodged, the 30 day period begins to run. At the expiration of the 30 day period, the sending state must offer to deliver temporary custody of the prisoner to the receiving state. This is provided in Article 5. Article 5 provides that at the expiration of the 30 day period, the sending state must respond to the offer made by the receiving state. Once the sending state makes an offer to deliver temporary custody, once that is received by the State of Rhode Island, then Rhode Island, and only then, can Rhode Island go to Massachusetts and retrieve the prisoner. The 120 day period set forth in Article 3 begins to run once the prisoner arrives in Rhode Island. None of that occurred in this case, for reasons which have not been explained. The Commonwealth of Massachusetts did not send an offer of temporary custody to Rhode Island.

"Mr. Dambruch has orally represented that at some point in April or in early May of 1993, the State of Rhode Island was informed that the defendant refused to exercise his rights under the detainer. This may very well be supported by Defendant's Exhibit A for Identification, a letter written by Mr. Dambruch to Mr. Werner's then attorney Mr. Corley.

Notwithstanding that oral representation, Defendant's Exhibit B demonstrates that on May 20, 1993, Mr. Corley, on behalf of Mr. Werner, wrote to MCI Concord, and indicated to them that Mr. Werner wished to exercise his rights under the Interstate Agreement on Detainers.

"Defendant's Exhibit C for Identification is a letter written by the defendant to the Superintendent at MCI Concord, which also indicates that he was anxious to resolve all pending matters in the State of Rhode Island.

"What happens next is of significance to this proceeding, because on June 11, 1993, Mr. Werner does, in fact, receive Form 1, which is the notice of untried indictment. He also executes Form 2, which is the request for disposition of criminal charges. Attached to Form 2 is Form 3, which is the Certificate of Inmate Status, and attached to Form 3 is Form 4, which is the offer to deliver temporary custody to the State of Rhode Island by the Commonwealth of Massachusetts. According to Mr. Dambruch, these documents were received by the Attorney General on June 23, 1993. The defendant has presented no evidence to refute that date. Thus, the Court finds that the defendant's temporary custody in Rhode Island, pursuant to Article 3, and not Article 4, of the Interstate Agreement, and that the trial in this matter is thus governed by the 180 days set forth in Article 3.

"When does the 180–day period begin to run? The law in this case is quite clear that the 180 day requirement begins to run when the Attorney General receives both the prisoner's request for disposition and the Certificate of Inmate Status. In this case, that date is June 23, 1993.

"Counsel for the defendant also presented another argument, that on April 5, 1993, Mr. Justice Wiley granted a petition for Writ of Habeas Corpus in a separate case. That case is indictment K1–92–875, which is also the subject of this Motion to Dismiss. Counsel for the defendant argues that the petition for Writ of Habeas Corpus, and the order signed by Judge Wiley, as well as the arguments made by Mr. Werner's attorney in support of the petition, served to establish the receipt of both the request for the disposition, and the Certificate of Inmate Status. In other words, counsel's position is that the proceedings before Mr. Justice Wiley substituted [for] the documents required to trigger the 180 days. This is simply not the case. The Court finds that the proceeding held by Mr. Justice Wiley cannot substitute for the specific documents required by the Interstate Agreement on Detainers. The Court further notes that on that day, the detainer had not even been lodged in the Commonwealth of Massachusetts."

The justice went on to comment further:

"Thus, with respect to indictment K1–90–0804, today is the 166th day. Thus, the Court with respect to this case, need not address the delay caused by this defendant. However, the Court does note that trial in this matter did commence in September. The trial commenced, it did not conclude, and the Court found that the reason the trial did not conclude was because Mr. Werner dismissed his attorney.

"With regard to the other two cases, which is K1–92–0875 and K2–88–0490 [the information upon which this appeal is pending], the Court also denies the defendant's motions to dismiss. The Court did set a date certain for those trials, both of which would have been held within the 180 day period. The Court, however, in open court, with either the defendant or Mr. Corley present, found that good cause necessitated a continuance of those matters. The record is clear in both of those matters, as well as this matter, that a period of weeks did elapse, at which point Mr. Werner did not have an attorney. This Court made great efforts in obtaining counsel for Mr. Werner, and that at least during that period, caused what's sufficient to warrant the continuance of both of those cases. The Court will note that those continuances were both necessary and reasonable."

Before the appearance on December 6, 1993, Werner had been presented to the same justice in Kent County on September 29, 1993, to begin pretrial hearings on that case. At that time defendant demanded that the justice recuse herself. When this request was denied, he sought a stay of further proceedings so that he could seek a review of her refusal to recuse from this case. At that time he was represented by Mr. Corley, whom Werner sought to discharge because he was dissatisfied with the attorney's representation. After a considerable colloquy, the justice declined to authorize Mr. Corley to withdraw. At this point, Werner emphatically refused to have Attorney Corley represent him. He became disruptive and threatened to absent himself from the proceedings. On September 30, 1993, Attorney Corley moved to withdraw on the ground that it was impossible for him to continue to represent defendant. The justice granted the motion to withdraw and said that she would appoint new counsel for defendant but that appointment of new counsel would constitute good cause to grant a necessary and reasonable continuance of the trial that would take it outside the 180–day period during which a trial must commence under Article III of the IADA. At

this point, defendant made an obscene statement to the motion justice who ordered him to be removed from the courtroom. She confirmed her ruling and finding that the appointment of new counsel "is a necessary and reasonable circumstance to grant a continuance beyond the 180 day rule." She also assured Mr. Corley that he still was representing defendant and that she would appoint new counsel as soon as possible.

When defendant Werner came before the motion justice on December 6, 1993, he was represented by new counsel, Attorney Vincent Indeglia. It was Mr. Indeglia who presented the motion to dismiss the indictment pending before the motion justice, as well as the criminal information in the case at bar, based on Article IV of the IADA.

■ At this hearing, it was disclosed that a letter was written to prison officials in the Commonwealth of Massachusetts on April 8, 1993, purporting to lodge a detainer in respect to Werner. The letter was received by Massachusetts prison officials on April 12, 1993. This triggered a thirty-day period for Massachusetts authorities to respond to the transfer. It was further disclosed that during the thirty-day period, on May 5, 1993, penal authorities at the Massachusetts Correction Institute at Concord informed representatives of the Rhode Island Attorney General that when defendant Werner was presented with the Rhode Island detainer and advised of his rights under the IADA, he refused to sign the required forms and told the Massachusetts authorities that he would not voluntarily return to Rhode Island to face the charges that were then pending against him. At this time, counsel for the state wrote to Attorney Corley (who was then still representing Werner) and advised him that Werner's refusal voluntarily to return would delay the process of bringing him to Rhode Island to face the pending charges.

In response to this letter, Mr. Corley wrote to the Massachusetts officials at MCI Concord informing them that Mr. Werner would voluntarily return and asked that Werner be given the requisite forms to execute to implement the process. On June 23, 1993, defendant Werner filed his request with the Massachusetts authorities to be transferred to Rhode Island pursuant to the terms of the IADA. It was for this reason that the justice on December 6, 1993, determined that this was the date upon which the 180–day period for bringing Werner to trial had commenced.

■ We have considered the record of the proceedings leading up to the decision of the motion justice on December 6, 1993. We have examined the IADA in its entirety, as well as the case law that has interpreted its purpose and provisions. We conclude that the findings of fact made by the motion justice were amply supported by the evidence presented. We further hold that her conclusions of law were correct in the light of the findings of fact and the tactics Mr. Werner used in dismissing his attorney and in frustrating his return to the State of Rhode Island until June 23, 1993. We agree that the writ of habeas corpus issued by another justice of the Superior Court on April 5, 1993, did not constitute an effective detainer (nor did it purport to do so) and did not trigger any obligation either by Massachusetts or Rhode Island to return Mr. Werner to this jurisdiction.

Consequently, we are of the opinion that the motion justice was correct in denying the motion to dismiss the various proceedings then pending, including the information that now is before us on the ground that there had been a violation of the provisions of the IADA.

■ After a trial before the justice who had denied his motion to dismiss, defen-

dant Werner discharged Attorney Vincent Indeglia. Subsequently, Werner was presented to another justice of the Superior Court for the trial of the information containing charges in the case at bar and sought to dismiss those charges for lack of a speedy trial pursuant to the holding in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). That justice denied his motion to dismiss. He adopted the findings of the previous motion justice in respect to the alleged violation of the IADA and further held that the delay could not be attributed to the state. He noted that Werner's discharge of attorneys contributed to the delay. He also referred to the fact that Werner had absconded on an outstanding Rhode Island warrant when he had been released on bail in Massachusetts. He also found that Werner for a time had refused to cooperate in the attempt by Rhode Island authorities to have him transferred to Rhode Island pursuant to the IADA. We agree with the findings of fact and conclusions of law enunciated by the justice who presided over the trial of the charges set forth in this information as well as the findings of fact and conclusions of law enunciated by the first motion justice on December 6, 1993. Both justices were correct in refusing to dismiss the charges for violation of the IADA and for the alleged violation of his right to a speedy trial.

## II

### The Motion to Suppress

The defendant argues eloquently to this Court that the trial justice erred in denying his motion to suppress the evidence found in Apartments 14A and 14B Brookside Avenue on the ground that defendant had been arrested illegally inside a dwelling house in which he had a reasonable expectation of privacy. He contends that this arrest was illegal pursuant to the prin-

ciples enunciated in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In that case, a New York policeman arrested the defendant in his home in March 1974 for two armed robberies that he had committed in 1971. *Id.* at 578, 100 S.Ct. at 1376, 63 L.Ed.2d at 646. The officers were acting pursuant to a New York statute that purported to authorize an arrest within a dwelling, without a warrant, if the police had probable cause to arrest. *Id.* In *Payton*, Justice Stevens, speaking for the Court, held that an arrest without a warrant in a dwelling was a violation of the Fourth Amendment and further declared that the fruits of such an arrest (evidence seized in the dwelling) should have been suppressed. *Id.* at 590, 100 S.Ct. at 1382, 63 L.Ed.2d at 653. The Court stated that a warrantless arrest inside the suspect's dwelling would be valid only in the event of exigent circumstances. *Id.* The New York prosecutorial authorities did not raise the issue of exigent circumstances in that case, since they were relying solely on statutory authorization. The New York statute, together with twenty-four similar statutes of other states, was declared to be invalid. *Id.* at 599–603, 100 S.Ct. at 1386–88, 63 L.Ed.2d at 658–61.

In the case at bar, defendant was not arrested inside the dwelling house. As we noted earlier in the statement of facts, the police traced defendant to the apartment building at Brookside Avenue after talking to his sister very early on the morning of May 15, 1988, and thereafter through checking the records of a traffic offense that referred to defendant as residing at that address. The shootings of the victims occurred shortly after midnight. The police located the Mercury Monarch automobile a brief time thereafter. Items inside the automobile led them to the home of Werner's sister, who suggested that her

brother was living with Dennina Prefontaine. She did not know his exact address but suggested that it was in the vicinity of Brookside Avenue in West Warwick. Sergeant Appollonio associated Werner with the address at 14B Brookside Avenue by checking the records of the traffic division at the West Warwick Police Department as soon as it opened. The police arrived at 14 Brookside Avenue at about 10 a.m. The officers knocked loudly on the front door of the apartment building and announced their presence. Ms. Prefontaine appeared at a window and was ordered to come outside. She did so and was accompanied by Norman Ducharme, whom she had met the night before. The officers asked Ms. Prefontaine whether Werner was in the building. She answered in the negative.

Almost simultaneously, Det. Santos saw Werner open a window and lean out. Detective Santos believed that Werner intended to escape through the window. He ordered Werner to halt. Werner ducked back inside the building, and shortly thereafter came to the front door. He was ordered outside by Sgt. Appollonio. He was arrested as he emerged from the building, was handcuffed, and taken into custody. The trial justice in this case found as a fact that the arrest took place outside the dwelling. He therefore did not reach the question concerning whether there were exigent circumstances that justified the arrest assuming it took place inside the dwelling. The defendant cites a number of decisions in which federal appellate courts determined that the *Payton* doctrine applied when the suspect was ordered to leave his dwelling by coercive police conduct. *See, e.g., United States v. Maez,* 872 F.2d 1444, 1457 (10th Cir.1989) (which cited *United States v. Morgan,* 743 F.2d 1158, 1166 (6th Cir.1984) in holding that this arrest outside a trailer constituted a constructive entry even though no physical entry had occurred). For purposes of this opinion, we shall assume, without deciding, that the arrest outside the dwelling involved a constructive entry in which the police ordered defendant to emerge from the building and then placed him under arrest.

## A. Probable Cause and Exigent Circumstances

From the record in this case, we hold unequivocally that the West Warwick police had probable cause to arrest Werner for the shootings of Stoddard and Burton and the possession of a sawed-off shotgun. The contents of the vehicle verified that Werner had been an occupant and probably had driven the vehicle. These facts alone constituted ample probable cause to believe that Werner had driven the vehicle, had taken a shotgun from it, and had, with little or no provocation, shot two people after threatening McGonigle with the same gun. From the items in the vehicle, the police were led to Werner's sister at an address on 200 Lockwood Street. This was the address contained on magazine subscriptions relating to Werner. Werner's sister gave the police information which, with further investigation, would associate Werner with the dwelling at 14B Brookside Avenue. This entire investigation took no more than ten hours. The defendant argues that this was a planned arrest. It certainly bore no relationship to the circumstances disclosed in *Payton.* The arrest here bears a much closer relationship to that which occurred in *State v. Gonsalves,* 553 A.2d 1073 (R.I.1989). In that case, we stated:

"Whether circumstances rise to the level of exigency is determined by referring to the facts known to the police at the time of the arrest. *See United States v. Williams,* 612 F.2d 735, 739 (3rd Cir.1979). '[T]he police [must] have an objective, reasonable belief that a

crisis can only be avoided by swift and immediate action.' *Duquette v. Godbout*, 471 A.2d at 1363 (citing *State v. Benoit*, 417 A.2d at 900). We find little merit to defendant's contention that the police had no reason to believe that Gonsalves was randomly violent or in possession of a firearm.

"On the facts of the case before us, police officers promptly responded to the report of a shooting. They received information from a credible eyewitness that defendant had shot his brother. These facts alone established a reasonable basis for investigating authorities to infer that defendant was capable of irrational and violent behavior. As a result of an ongoing investigation in the field, the police located Gonsalves at Anna Hall's apartment less than one hour after the shooting. We conclude that the police reasonably believed defendant to be 'armed and dangerous' and in a highly emotional state after shooting his brother." *Gonsalves*, 553 A.2d at 1075.

In the case at bar, defendant had engaged in irrational and violent conduct with little or no provocation. The police knew that he had been armed with a shotgun. No shotgun was found in the Mercury Monarch. Consequently, the police had every reason to believe that defendant was still armed and dangerous. They had every reason to believe that he was capable of violent and irrational conduct. As we pointed out in *Gonsalves*, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Gonsalves*, 553 A.2d at 1075 (quoting *State v. Jennings*, 461 A.2d 361, 366 (R.I.1983)). Under the circumstances of this case and the facts known to the police when they arrived at the apartment building at 14 Brookside Avenue, West Warwick, they had every reason to believe that an armed and dangerous fugitive was hiding in the building, that he would escape if given a chance, and that he was capable of violent and irrational conduct unless they arrested him immediately.[1]

Consequently, we are of the opinion that the arrest of Werner was based upon ample probable cause to believe that he was guilty of the shooting of Messrs. Stoddard and Burton, as well as an assault upon McGonigle, and also upon exigent circumstances that justified an arrest without a warrant. We conclude that there was no violation of the principles enunciat-

---

1. It is worthy of note that this Court made a finding of fact and held as a matter of law in *State v. Werner*, 615 A.2d 1010, 1014 (R.I. 1992), that the search of the automobile would have been valid even under the rule of *State v. Benoit*, 417 A.2d 895 (R.I.1980), since the search of the automobile was based upon exigent circumstances. We commented as follows:

"Although we applied the federal rule in determining the validity of the search in this case, we are compelled to point out that we would have held the search to be valid even under the rules stated in *State v. Benoit*. This court has held that '[t]he need to protect or preserve life or avoid serious injury' constitutes an exigent circumstance that justifies what would otherwise be an illegal search. *State v. Gonsalves*, 553 A.2d 1073, 1075 (R.I.1989) (quoting *State v. Jennings*, 461 A.2d 361, 366 (R.I.1983)). In the case at hand, when the officers came upon the automobile, they had probable cause to believe that the automobile might contain a dangerous weapon or evidence leading to the whereabouts of the perpetrator of a violent crime. The officers also had reason to believe that the immediate apprehension of this perpetrator might be necessary in order to prevent further violence. Thus, at the time of the search, a substantial element of exigency existed." *Werner*, 615 A.2d at 1014.

Certainly, these elements of exigency continued to exist when the officers encountered Werner when he appeared at a window in the rear of the building at approximately 10 a.m. that same morning.

ed in *Payton,* even assuming, without deciding, that the arrest of Werner was associated with a constructive entry into the apartment building on Brookside Avenue, West Warwick. The defendant's argument on this issue cannot prevail.

### B. The Seizure of Evidence from the Apartments at 14A and 14B Brookside Avenue

The defendant contends that the evidence obtained from both apartments at Brookside Avenue (14A—the empty apartment and 14B—the fully-furnished apartment) should have been suppressed. The state counters this argument by pointing out that the evidence seized from Apartment 14B was obtained by virtue of a search warrant issued by a justice of the Superior Court based upon probable cause set forth in an affidavit executed by Det. Robert H. Sylvesta under oath. The contents of the affidavit are as follows:

"ON THE DATE OF 5–15–88 SUNDAY MORNING AT THE TIME OF 0:09 HRS THE POLICE WERE CALLED TO 23 CRAWFORD ST. JOHNNY RAYS BEEF AND BREW, ON A REPORT OF A MAN WITH A GUN, ON ANOTHER CALL IT WAS LEARNED THAT SHOTS HAD BEEN FIRED, WHEN THE POLICE ARRIVED AT THE SCENE, IT WAS LEARNED THAT TWO MEN HAD BEEN SHOT THEY ARE IDENIFIED [*sic*] AS LOREN STODDARD, MICHAEL McGONIGLE, IT WAS LEARNED FROM WITNESSES AT THE SCENE, THE SUBJECT WITH THE GUN HAD FLED THE SCENE IN A SILVER AND BLACK MERCURY AND THE SUSPECT WAS IDENIFIED [*sic*] AS BEING TALL WITH SHORT HAIR. THE SUSPECT VEHICLE WAS LOCATED A SHORT DISTANCE FROM THE SCENE OF THE SHOOTING AND PAPER WITH THE NAME OF KEITH WERNER WAS LOCATED INSIDE, WITH THE NAME AND ADDRESS ON SEVERAL PAPERS. AT THE TIME OF 5–15–88 10:30 AM, DET. SGT. ROSSI, CHIEF VENTURA DETS. SYLVESTA, O'CONNELL [*sic*], SANTOS SGT. APPOLLONIO AND PTLM[.] DICARLO, RESPONDED TO 14–B BROOKSIDE AVE. AND THE SUSPECT WERNER WAS TAKEN INTO CUSTODY, SUSPECT WERNER ALSO WANTED ON A NEW YORK CITY WARRANT. BASED ON A DESCRIPTION GIVEN BY WITNESSES AT THE SCENE OF THE SHOOTING, IT APPEARS THE SUSPECT WERNER AND THE MAN WITH THE GUN, ARE ONE IN [*sic*] THE SAME. IT SHOULD BE FURTHER NOTED, ON THE DATE OF MAY 15, 1988 AT THE TIME OF 10:30 AM WHILE EFFECTING THE ARREST OF WERNER FOR THE OUTSTANDING WARRANT ISSUED BY THE CITY OF NEW YORK, A 1974 CHEV. MONTE CARLO COLOR BLACK, R.I. REG. SX–336 WAS OBSERVED PARKED IN THE DRIVEWAY OF 14–B BROOKSIDE AVE. OWNER RAY NEGLEY STATED THAT HIS CAR HAD BEEN SHOT WITH A SHOTGUN."

The defendant argues that this warrant constituted the fruit of an illegal arrest in that the establishment of probable cause set forth in the affidavit depended on material the police learned in the course of the arrest. We already have determined that the arrest was not illegal. This alone would be a basis for rejecting defendant's argument on this issue.

■ However, even if defendant's argument had merit on the illegality of the

arrest, we still would hold that the affidavit establishes ample probable cause based upon facts learned before the arrest. The identification of the suspect, the identification of the vehicle, the association of the vehicle with Keith Werner, all establish probable cause to believe that the suspect Werner and the man with the gun, in the language of the affidavit, were "ONE IN [*sic*] THE SAME." The material contained in the affidavit concerning the outstanding warrant issued by the City of New York is surplusage, as are the further facts concerning a 1974 black Chevrolet Monte Carlo parked in the driveway of 14B Brookside Avenue. The heart of the affidavit is the portion that unequivocally established that a crime had been committed and the further statement, *"BASED ON A DESCRIPTION GIVEN BY WITNESSES AT THE SCENE OF THE SHOOTING, IT APPEARS THE SUSPECT WERNER AND THE MAN WITH THE GUN, ARE ONE IN [sic] THE SAME."*

All these facts had been established before the police arrested Werner. Thus, the probable cause set forth in the affidavit was in no way derived from Werner's arrest. The trial justice's comments are instructive.

The trial justice, after hearing evidence to support a motion to suppress as well as a defense motion to dismiss, made the following comments:

"The Court also finds that had the arrest been based solely on the New York warrant that they would [have] indeed resulted in a *State v. Taylor* [, 621 A.2d 1252 (R.I.1993) ] situation because our case law still is clear that you must have the warrant for review by the court in order to establish appropriate probable cause. But the Court finds in this case that that is not the situation here, that regardless of the fact that the police may have felt that they were operating on a valid New York warrant, they also were independently acting upon probable cause which they had developed from their investigation from the time of the shooting in the early morning hours through the ten o'clock hour when the arrest was effectuated.

"And also as the Court has also indicated, the Court finds as fact for the purposes of this hearing that the arrest was made without a warrant upon probable cause outside of the building. The Court does not find any fundamental unfairness in the arrest or the process used to arrest this defendant. It was a pl[e]thora of evidence available and discoverable by the police which did lead to the defendant's arrest and apprehension and certainly did, in this Court's view, amount to probable cause."

In the course of the hearing, the trial justice found the testimony of the police to be credible and consistent. He rejected the testimony of defendant and his witnesses as unreliable.

The evidence found in Apartment 14B consisted of six shotgun shells—four live and two spent—a box containing one shell, and a shotgun cleaning kit. Police also seized photographs of Werner holding a shotgun. The photographs were taken from the door of the refrigerator in the apartment. The police further found a plastic garbage bag similar to the bag witnesses described as having contained the shotgun. This was found in a common hallway in plain view.

Certainly, the warrant issued by a justice of the Superior Court is entitled to all deference from this Court in terms of its validity and its basis upon probable cause. The respect accorded to a warrant issued by an impartial judicial officer has been set forth numerous times by the Supreme Court of the United States and particular-

ly eloquently in *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965), in which courts were admonished to give such a warrant and the affidavit that supports it a common-sense interpretation.

The trial justice also relied on *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) as insulating the search from any taint of illegality that might have arisen from the arrest. We believe that no such taint existed, but agree with the trial justice that any such taint would have been removed by the independent issuance of the warrant before any search of the apartment took place.

In respect to the search of Apartment 14A in which Det. O'Connell found the sawed-off shotgun concealed in the drop ceiling, the trial justice held that Werner had no standing to object to that search because he had no reasonable expectation of privacy therein.

■ To support this holding, the trial justice found as a fact that Werner resided in Apartment 14B with Ms. Prefontaine, his girlfriend. This finding was amply supported by evidence given at the trial and provided to the police before trial. It was virtually undisputed that Apartment 14A was completely empty and the door was ajar before Det. O'Connell entered the vacant area. The defendant's argument that he had access to the apartment in the course of his managerial duties (even if taken at face value) would not have given him an expectation of privacy that society would accept and therefore give him standing to object to the search of Apartment 14A, which he had never used as a dwelling. *See United States v. Brazel,* 102 F.3d 1120, 1148–49 (11th Cir.1997); *State v. Jardine,* 110 R.I. 491, 494–95, 293 A.2d 901, 903 (1972). The trial justice made the following comments and findings to support his ruling:

"Now, the Court in this matter after weighing the credibility of the witnesses does not find the testimony of the defendant credible on the prospect that he lived in 14A. The Court does not believe that testimony and, in fact, believes the testimony of Detective O'Connell that the apartment was empty when he conducted the search of 14A.

" * * *

"The law supports an individual's rights to privacy. The law does not support a defendant's right to protection from secreting of a firearm to avoid prosecution. Fo[u]rth Amendment rights are personal rights not to be asserted vicariously by a defendant because that defendant is aggrieved by the introduction of damaging evidence.

"In this case, the Court finds as fact that the door to the apartment 14A was partially open, that the apartment was vacant, and that the shotgun alone was hidden in the ceiling. The Court finds that a ceiling area is not an area normally used to store goods used in common experience but to hide contraband.

"Even if the defendant had a subjective expectation of privacy, that expectation in this case in the light of the Court's specific findings and in the light of the totality of the circumstances, considering the defendant's lack of ownership or possession in the areas searched, he certainly did have possessory interest in the weapon seized, historic use or lack of use of the area as indicated by the record, and that use, the Court finds as fact, was casual and infrequent at best, and he was not specifically permitted by either Michael or Joy Coletta–Reisert [owners of the building] to use, store or in any way exercise absolute dominion or control over these premises.

"The Court finds as fact that under the totality of the circumstances and applying the two-prong test and other factors indicated by case law that our society would not find the defendant's subjective expectation of privacy as one which is object[ively] reasonable."

We are of the opinion that the trial justice's findings of fact were supported by the evidence presented by the parties. We also agree with his conclusions of law in the exercise of our independent judgment as required by *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911, 919 (1996).[2]

Consequently, we hold that the trial justice did not err in admitting the evidence seized from Apartments 14A and 14B and the common hallway of the apartment building on Brookside Avenue in West Warwick.

### C. Other Issues

We have examined other issues that defendant raised in challenging the search warrant and find them unpersuasive. We conclude that the trial justice did not err in denying defendant's motion to suppress the evidence seized in the execution of the search warrant.

### D. The Inevitable Discovery Doctrine

We agree with defendant and the state that the inevitable discovery doctrine has no application to this case. However, we conclude that this doctrine was not necessary to the determination that the evidence seized from Apartments 14A and

14B was admissible on the grounds stated previously in this opinion.

## III

### Probable Cause for the Arrest of Defendant Werner

In his brief, defendant argues that he was arrested without probable cause. We have determined earlier in this opinion that the West Warwick police had ample probable cause to believe that a number of crimes had been committed and that Werner probably was the person who had committed these crimes. We believe that the information available to the police before the arrest met all the standards set forth in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) and its progeny, as well as our own substantial case law on this subject, including *State v. Guzman,* 752 A.2d 1 (R.I.2000); *In re Armand,* 454 A.2d 1216 (R.I.1983).

## IV

### The Admission of Expert Testimony by Gerald Gorman

■ The defendant argues that Gerald Gorman was improperly allowed to testify as an expert witness that the shotgun displayed in two of the photographs seized from Apartment 14B was the same as the shotgun seized from the drop ceiling of Apartment 14A. Gerald Gorman was a commander of the West Warwick Police Department and was qualified as a firearms expert. The defendant contends that he should not have been permitted to testify on this subject because the state had

---

**2.** At oral argument, counsel for defendant conceded that the defense would not challenge the legality of the search of Apartment 14A. This waiver would exclude that issue from contention. However, in spite of that concession and waiver, we have independently reviewed the trial justice's findings of fact and conclusions of law in respect to the search of Apartment 14A and defendant's lack of standing to object to the search of that apartment and have affirmed both the findings of fact and the conclusions of law as though they were in contention in this case.

failed to disclose his anticipated testimony to the defense before calling this witness to testify. The defendant argues that this ruling violates Rule 16 of the Superior Court Rules of Criminal Procedure. The events leading up to Commander Gorman's testimony were as follows.

Initially, defendant filed a motion *in limine* to exclude five color photographs that Det. Santos seized from the door of the refrigerator in Apartment 14B during the course of executing a search warrant issued by a justice of the Superior Court. In support of the motion *in limine*, defendant argued that there was no evidence establishing a connection between the shotgun shown in the picture as held by Werner and the shotgun used to commit the crimes against Stoddard and Burton. Counsel for the state argued that the similarity between the weapon depicted in the photographs and that seized by the West Warwick police was visible and discernible to the members of the jury. The state argued that the jury should be able to use its own judgment in determining whether these weapons were one and the same. In deciding the motion *in limine*, the trial justice agreed that it was within the jury's province to determine whether the weapon seized and the weapon depicted in the photographs were the same. He therefore denied defendant's motion *in limine* to exclude the photographs.

Thereafter, during the trial of the case, Det. Santos testified concerning his seizure of the five photographs and further testified that two of the photographs purported to depict a black shotgun. At this point, counsel for defendant again moved to exclude the photographs, citing Rule 403 of the Rhode Island Rules of Evidence. This rule authorizes the exclusion of evidence that may be relevant but is determined to be unfairly prejudicial. After hearing the arguments of counsel, the trial justice, at this point in the trial, concluded that the potential for unfair prejudice from the introduction of the photographs was too great and he therefore excluded them from evidence. Thereupon, counsel for the prosecution said that she intended to make an additional effort to establish from witnesses available to the state "that the weapon in the photo is the same as state's 7 * * *." She further said that she wanted to alert the court to anticipate that line of questioning and that thereafter she would renew her motion to admit the photographs.

It was in this context that the prosecution presented Commander Gerald Gorman as an expert witness and asked him to compare the weapon seized from Apartment 14A with the weapon depicted in two of the photographs. A *voir dire* examination of Commander Gorman was held outside the presence of the jury. In the course of the *voir dire* examination, Commander Gorman testified that the shotgun, which was a Mossberg commando weapon, had been altered in a number of ways that made it uniquely identifiable. In effect, he said that the weapon had become "homemade." He stated that in his opinion it was the same weapon as that shown in two of the photographs. He went on to say that there were not that many weapons so altered to be found.

Defense counsel objected on the ground that the state had failed to provide advance notice of this testimony pursuant to Rule 16(h) of the Superior Court Rules of Criminal Procedure. This rule required the state to fulfill a continuing duty to update its discovery during the course of the trial. The trial justice denied defendant's motion to exclude on this ground with the following comment:

"The State had every good reason to believe that the Court would allow the pictures that the Court had refused so

far to allow in evidence * * * they were found as the result of an authorized search warrant * * * and that they stated every reason to believe they were probative, relevant, and material to the case at hand, and * * * the main reason * * * that the Court declined to admit them was because of what this Court felt to be the extreme undue prejudice to this defendant * * *."

The trial justice further found that defendant could not have been surprised by this testimony because the prosecutor earlier had said—when the trial justice decided to exclude the photographs—that she would attempt by further testimony to increase the nexus between the weapon depicted in two of the photographs and the actual weapon in evidence. The trial justice further stated that Commander Gorman was a witness whose expertise was known in advance to the defense. He therefore decided to admit Commander Gorman's testimony and two of the photographs in which the shotgun was depicted. The trial justice found that there was no discovery violation by the state. He noted that the defense had been notified in advance of trial that Commander Gorman would be called to testify as a firearms expert. He further noted that when he had suggested the necessity to establish a nexus between the actual weapon and the weapon shown in the two photographs, the prosecutor stated emphatically that she intended to establish this nexus, thus alerting the trial justice and defendant's counsel of her intent to establish the connection from witnesses available to her.

Considering the context in which the trial justice admitted Commander Gorman's testimony after his earlier ruling of exclusion, which followed his denial of a motion *in limine*, he did not err in deciding that the state had not committed a discovery violation pursuant to Rule 16(h).

The state certainly was surprised by the trial justice's ruling and did not deceive defendant by using Commander Gorman to provide the necessary comparison between the weapon depicted in the two photographs and the weapon seized from Apartment 14A.

## V

### The Exclusion of Prior Convictions of Certain State's Witnesses

Before the trial began, counsel for the state moved *in limine* to preclude the introduction of the criminal records of prospective witnesses for the state, Loran Stoddard, Michael McGonigle, Kenneth Gammon and Frank Burton for the purpose of impeaching their credibility. The trial justice granted the motion. On appeal, defendant cites as prejudicial error the granting of the motion in respect to Kenneth Gammon and Loran Stoddard. The specific records in regard to these prospective witnesses were as follows:

#### KENNETH GAMMON

(1) 1983 reckless driving: $100 fine;

(2) 1982 malicious damage: plea of guilty, 6 mos. probation plus restitution;

(3) 1982 possession of marijuana: $75 fine imposed;

(4) 1982 drug possession: 3 years suspended and probation;

#### LORAN STODDARD

(1) 1988 disorderly conduct: $25 fine plus court costs;

(2) 1987 driving under the influence: minimum penalty;

(3) 1987 operating on a suspended license: $500 fine plus costs;

(4) 1983 resisting arrest: $50 fine plus costs;

(5) 1983 disorderly conduct: $25 fine plus costs;

(6) 1981 larceny under $500: $25 fine plus costs;

(7) 1979 filing false police report: $50 fine plus costs.

The trial justice found that Stoddard's record was "stale" and that the jury probably would consider the disorderly conduct and driving-under-the-influence charges as evidence of bad character rather than an attack upon his credibility. He commented as follows:

"I really feel if I allow this minor record to go before the jury, even with the usual and appropriate explanation regarding credibility, that it would serve no other useful explanation than to poison the mind of the jury with regard to Mr. Stoddard because of the nature of these offenses, and they would not use it for assessing their credibility whatsoever but would be more likely to assess his propensity for either alcohol consumption or aggressive behavior and that is simply not on trial here * * *."

In respect to Kenneth Gammon, the trial justice found as a fact that each of the prior convictions was "stale" and "not probative, relevant and material to his credibility." For these reasons, the trial justice granted the motion *in limine.*

The defendant cites many cases in which we have upheld trial justices' rulings that admitted evidence of prior convictions for impeachment purposes over defense objections that such convictions were remote in time. *See, e.g., State v. Simpson,* 606 A.2d 677, 680 (R.I.1992); *State v.Taylor,* 581 A.2d 1037, 1040 (R.I.1990); *State v. Pope,* 414 A.2d 781, 784 (R.I.1980). In each of these cases, the trial justice advanced reasons for his ruling that this Court believed to be sufficient to overcome an argument that the admission of such evidence constituted an abuse of discretion.

In the case at bar, the trial justice determined that the prejudice that would result from the admission of these prior convictions outweighed the probative value of the evidence in respect to the credibility of the testimony of the witness. There is no question that the standard used by this Court in reviewing a trial justice's ruling to admit or exclude such evidence is one of abuse of discretion. In construing Rule 609 of the Rhode Island Rules of Evidence, the trial justice has broad discretion. *State v. Maxie,* 554 A.2d 1028, 1032 (R.I.1989). We also have held that the trial justice has an obligation to weigh the potential for prejudice against the probative value of such evidence on the issue of credibility. *Simpson,* 606 A.2d at 680. We also have held that weighing the element of remoteness in time in respect to determining prejudice lies within the discretion of the trial justice. *State v. Camirand,* 572 A.2d 290, 295 (R.I.1990). Indeed Rule 609(b) provides in part as follows: *"Discretion.* Evidence of a conviction under this rule is not admissible if the court determines that its prejudicial effect substantially outweighs the probative value of the conviction." The rule also notes that if the conviction is for a misdemeanor not involving dishonesty or false statement, the evidence may be challenged. *Id.* Such evidence also may be challenged for remoteness in time. *Id.*

There is no question that this Court has upheld the rulings of trial justices allowing evidence of prior convictions to be introduced using the abuse of discretion standard. The standard of abuse of discretion is one that gives extreme deference to the trial justice's determination. Upholding a trial court's discretionary ruling does not imply that the appellate court necessarily would have ruled in the same manner as the original determination. In

the case at bar, the trial justice may well not have committed an abuse of discretion if he admitted the challenged convictions. By the same token, we conclude in this case that considering the nature of the convictions and the dates of the convictions in relation to the time of the trial, we cannot say that the trial justice committed an abuse of discretion in ruling as he did for the reasons advanced in support of said ruling. Therefore, we hold that the trial justice did not commit an abuse of discretion or reversible error in granting the state's motion *in limine* to exclude the evidence of prior convictions in respect to witnesses Stoddard and Gammon.

## VI

### Jury Instruction on Witness Identification

■ The defendant contends that the trial justice committed reversible error in that portion of his instructions to the jury relating to eyewitness identification. The challenged portion follows:

"You may take into account both the strength of the identification and the circumstances under which the identification was made which includes whatever condition you may find that the witness was in when he viewed the defendant. *You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to a witness.* You may also take into account any occasion in which a witness failed to make an identification." (Emphasis added .)

■ The defendant contends that the trial justice's allusion to the comparison between the selection of a photograph from an array of individuals in comparison to the selection of a single individual constituted an unfair comment upon the evidence. We agree with defendant that the trial justice is obliged to be scrupulously fair to the defendant and to the state and that the justice "must not infringe upon the factfinding province of the jury by coercion or improper suggestion." *State v. Souza*, 425 A.2d 893, 900 (R.I.1981). We also agree that "[i]t is not the function of a trial justice to act as [a trial] advocate for either the prosecution or the defense." *State v. Fenner*, 503 A.2d 518, 525 (R.I. 1986). We also agree that determining the reliability of eyewitness testimony and the trustworthiness of eyewitness observations is within the ken of the jurors. *State v. Porraro*, 121 R.I. 882, 892, 404 A.2d 465, 471 (1979). However, in the context of these acknowledged rules of law, we are unable to perceive that the trial justice's general observations taken from a set of model special instructions on identification adopted for use in the District of Columbia by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Telfaire*, 469 F.2d 552, 558 (D.C.Cir.1972), would violate any of these maxims. It is true that there was no out-of-court show-up in this case. It is also true that defendant was free to argue concerning the similarities of the array shown to Stoddard. The trial justice did not purport to comment on the similarity of the photographs or the reliability of the identification by witness Stoddard. He was only expressing some general guidelines that would apply to any consideration of eyewitness identification by a jury. At most, this portion of the instructions might be argued to be lacking in relevance since there was no show-up in the case at bar. Nevertheless, it did not indicate any opinion by the trial justice of the reliability of Stoddard's purported identification of defendant in this case from the photograph array.

It is true that this Court has held that the *Telfaire* model instruction need not be given by a trial justice in situations in which a defendant has raised the issue of a show-up or cross-racial identification. *State v. Payette*, 557 A.2d 72, 73 (R.I.1989); *State v. Andrade*, 544 A.2d 1140, 1143 (R.I. 1988); *State v. Hadrick*, 523 A.2d 441, 444 (R.I.1987). Our criticism of the instruction proposed by Judge Bazelon in respect to cross-racial identification in *Hadrick* is, of course, not applicable to the case at bar. In none of these cases did we state that giving a portion of this general instruction on a photograph array would constitute reversible error. At most, we said that this model instruction need not be given. The trial justice did not indicate any opinion concerning whether the other persons in the six-photo array bore resemblance to Werner, nor did he express an opinion in respect to Stoddard's ability to observe or recollect defendant's identity at the time of the shooting.

We reject defendant's contention that this instruction in any way constituted prejudicial error on the part of the trial justice.

## VII

### The Denial of Defendant's Motions for Mistrial

The defendant contends that on four occasions during the course of the trial the jury heard improper reference to other criminal activity by him. He points out that after each impropriety counsel for defendant moved to pass the case and each motion was denied. He further argues that each motion for mistrial should have been granted and that together the improper references had the cumulative effect of denying him a fundamentally fair trial.

The first instance was McGonigle's testimony that upon his initial encounter with Werner outside Johnny Ray's, defendant asked him for drugs. At this point, counsel for defendant moved for a mistrial on the ground that this reference was "highly prejudicial." The trial justice denied the motion and commented as follows:

"[T]his is such an integral part of the testimony of this witness that this was the only way in which the defendant allegedly or the shooter allegedly introduced himself to the witness, I really don't see how a reasonably, truthful sanitized version of that could be made and with the Court's curative instruction, the Court will make every attempt to dispel that motion."

The comment of the trial justice in denying the motion was both insightful and correct. For a reference to bad conduct to qualify as a basis for a mistrial, the comment must not only be prejudicial, but also irrelevant. *State v. Cline*, 122 R.I. 297, 330, 405 A.2d 1192, 1210 (1979). This testimony certainly was not irrelevant. It was necessary for Stoddard to describe his encounter with defendant. The exchange of conversation between them leading up to the shooting was not irrelevant, but an integral part of the witness's testimony, as the trial justice indicated. Since the testimony was not improper, it could not form the basis for a mistrial. In any event, at the request of counsel for defendant, the trial justice gave a long curative instruction to the jury.

This reference to drugs, though certainly prejudicial to defendant, did not have the effect of inflaming the jury, in light of the circumstances of this case. *State v. Botelho*, 753 A.2d 343, 349 (R.I.2000). Moreover, a defendant does not have the right to be insulated from relevant truths even when they are prejudicial. *Cline*, 122

R.I. at 330, 405 A.2d at 1210. The trial justice did his best to minimize prejudice by the curative instruction.

> "Well, as you know from all of our previous discussions, this case is not about drugs. No drugs were involved in this case. No drugs were found on anyone or given or received by anybody here. That reference is simply by way of introduction, the first contact that this witness is testifying that he had with whomever he is speaking about and if it turns out to be the alleged shooter in this case, I'm instructing you [ ]now that drugs have no place in this case. It has nothing to do with this case, and you may not in any way, shape or form consider this defendant or a person who is the subject of this testimony as having anything to do with drugs. Do you understand that, ladies and gentlemen?"

The trial justice did not err in refusing to grant defendant's motion for mistrial based upon McGonigle's testimony.

■ The defendant also argues that he was entitled to a mistrial after Stoddard's reference that he had identified defendant at the hospital from "a bunch of mug shots." No objection was made to this comment, but a short time later Stoddard again said that he had identified defendant from a mug shot. At this point, defendant's counsel objected and requested a mistrial because this testimony, combined with the reference to drugs, created significant prejudice to defendant. The trial justice denied the motion for mistrial but cautioned the jury as follows:

> "Mug shot in common parlance simply means an array of photographs shown by the police. I'm sure you have all heard that expression before. It doesn't connote anything with regard to this defendant's guilt or his participation in the crime or any other crime.

> "You will see later in this case, well, I believe you will probably see this photo array which is commonly called mug shots in the singular or plural, so don't read anything into the word mug shot. It has no significance of guilt or any indication of participation by this defendant in any criminal activity here or anyplace else."

We agree with the trial justice that this reference did not warrant granting a motion for mistrial. *See State v. Gardiner*, 636 A.2d 710, 718 (R.I.1994) (holding that the trial justice's refusal to pass the case was not an abuse of discretion because the jury instructions "cured" the improper questioning).

■ The defendant again moved for a mistrial when Ms. Prefontaine, in the course of her testimony, said that at one point she was living with Werner's sister while defendant was in jail. The trial justice denied the motion and gave a cautionary instruction.

> "All right, ladies and gentlemen, you just heard Ms. Prefontaine make an answer that she opened this particular box when she was living with the defendant's sister and he was in jail.

> "Now, that's an improper reference because it may lead you to believe that because he's in jail he may have done something else untoward or other. I don't know if he was in jail. If he was in jail, it's none of our concern whatsoever. You are to judge this case on its merits or lack of its merits according to the instructions that I give you. So I'm going to instruct you now to disregard any notion that this defendant may or may not have been in jail, what he may have been in there for, just put it out of your mind. It has absolutely no bearing on the guilt or innocence of this defendant in this case."

We are of the opinion that this cautionary instruction was sufficient to dispel any potentially inflammatory effect upon the jurors. We cannot assume in the light of the totality of the testimony in this case that a reference to jail would have so inflamed the jurors as to prevent their impartial examination of the evidence in the case. *State v. Brown*, 522 A.2d 208, 210–11 (R.I.1987).

■ The defendant also argues that he was entitled to the declaration of a mistrial when witness Gammon sought to change his testimony at trial from that given at a *voir dire* examination in which he said that he saw a gun similar to the shotgun in evidence in Werner's apartment on the day of the shooting. At trial he testified that the gun he saw was not the same as the gun introduced into evidence. Counsel for the state called Gammon's attention to the testimony he previously had given at the *voir dire* examination. She went on to ask Gammon whether he had received any threats relating to his testimony. He replied that he had not. At this point, defense counsel again moved for a mistrial on the ground of significant prejudice. The trial justice denied the motion and gave the following cautionary instruction:

> "The answer may stand. There's been no evidence of any threats in this case or any coercion by anybody against any witness whether it's a State or defense witness or anything, so I'm going to instruct you to disregard that question. The answer was no anyway. It has nothing to do with this case nor have there been threats or anything like that in this matter."

The trial justice commented that the prosecutor's question was "imprudent," but he concluded that any prejudice could be cured by the foregoing instruction. This holding was in accordance with the principles enunciated in *Brown*, wherein we observed that a mistrial should be granted only if the damage caused by a question or prosecutorial statement is inexpiable. *Brown*, 522 A.2d at 210. In the case at bar, we agree that the prosecutor's question, which elicited a negative answer, did not create incurable prejudice or inflame the jurors to a point where a prompt curative instruction would not be effective. *See also United States v. Mealy*, 851 F.2d 890, 902–03 (7th Cir.1988).

■ We also have considered defendant's argument that these four instances considered together created a context of fundamental unfairness and demands reversal. We respectfully disagree with this argument, though we recognize the principles enunciated in *State v. Pepper*, 103 R.I. 310, 318, 237 A.2d 330, 335 (1968) (holding that "the cumulative effect of the improper evidence is of such a character that the defendant was prejudiced thereby to such an extent that only a new trial can cure it"). We also recognize that the trial justice's decision to deny a mistrial is accorded great weight and will not be disturbed unless clearly wrong. *State v. Aponte*, 800 A.2d 420, 427 (R.I.2002). We hold that, in declining to grant the four motions for a mistrial, the trial justice did not commit an abuse of discretion in any of the four instances. We further hold that the cumulative effect of these rulings did not deprive defendant of a fundamentally fair trial. The trial justice did not commit reversible error either in the individual rulings or in the cumulative effect thereof.

## VIII

### The Trial Justice's Alleged Limitation of Defendant's Right of Cross–Examination

■ The defendant argues that in a number of instances the trial justice impermissibly curtailed his right of cross-

examination. We have held in numerous cases including *State v. Bustamante,* 756 A.2d 758, 765 (R.I.2000), that a defendant has a constitutional right to cross-examine witnesses presented by the prosecution. We also have held that a defendant must be accorded "reasonable latitude" to inquire into the bias, motive or prejudice on the part of a witness. *State v. Hazard,* 745 A.2d 748, 756 (R.I.2000). We also have held that the right to cross-examination is not unlimited and does not include an absolute right to ask any and every question that the defendant may desire. *State v. DePina,* 810 A.2d 768, 775 (R.I. 2002). When sufficient cross-examination has been allowed in order to satisfy the safeguards required by the Sixth Amendment to the United States Constitution and by article 1, section 10, of the Rhode Island Constitution, Declaration of Rights, further cross-examination may be limited or precluded within the discretion of the trial justice. *Bustamante,* 756 A.2d at 765.

■ The trial justice noted in this case that in the cross-examination of Sgt. Appollonio, defendant was urging his attorney to ask irrelevant and immaterial questions. For example, examination into the booking procedures of the West Warwick Police Department relating to Norman Ducharme was precluded on grounds of relevance. The trial justice ultimately limited, after an extensive examination concerning the towing of seized vehicles and responsibility for notifying their owners, a question that he deemed irrelevant concerning a vehicle survey required by the General Laws. The trial justice noted that this was a repetitive line of questioning and constituted nothing more than defendant's attempt to control and delay the proceedings.

■ The defendant raises the issue of his attempt to cross-examine witness Stoddard about his previous criminal convictions. The trial justice already had granted a motion *in limine* that we have considered in part V of this opinion. The attempt to cross-examine on this same issue certainly would have resulted in overruling the justice's earlier determination, which we have upheld. The fact that counsel for defendant ingeniously sought to use Stoddard's interrogatories in connection with his victim's compensation litigation was not a basis for requiring the trial justice to overrule his previous determination.

■ The defendant contends that the trial justice erred in limiting his attempt to cross-examine Det. Norman Frenette in relation to his report concerning a fingerprint from the shotgun that could not be matched with defendant's known fingerprint. The defendant sought to refer to an earlier report in which Det. Frenette determined that the fingerprint from the shotgun was not defendant's. The distinction between the two possible reports was of minimal significance, and the limitation by the trial justice of pursuit of this issue would, at most, be harmless error, if indeed it was error at all. *State v. Texter,* 594 A.2d 376, 378 (R.I.1991). In any event, defendant was allowed to cross-examine Det. Frenette on the discrepancies between the two reports. The trial justice declined to allow him to call former prosecutor Steven Dambruch to the stand in an effort to suggest that Dambruch had persuaded Det. Frenette to create another report that was more favorable to the state. The trial justice found this to be mere speculation.

We have examined defendant's arguments concerning limitations on his right to cross-examine in various contexts. We are of the opinion that no limitation imposed by the trial justice impaired the constitutional right of defendant to cross-examine. Any limitation imposed by the

trial justice was well within his discretion and in no instance constituted prejudicial error. The defendant has failed to establish that the trial justice violated his constitutional right to cross-examine the witnesses against him in the case at bar.

## IX

### Defendant's Supplemental *Pro Se* Brief

The defendant has filed a *pro se* brief as a supplement to the briefs filed by the public defender and additional counsel. This brief raises the following issues: (1) the refusal of the justice who passed upon his IADA claim to recuse herself; (2) the denial of his motion to dismiss because the state destroyed exculpatory evidence (the destruction of the Mercury Monarch by the wrecking company when it was unclaimed for eight days); (3) the denial of defendant's requests for transcripts of the testimony of certain trial witnesses and transcripts of certain preliminary hearing testimony to be furnished during the course of the trial; (4) the trial justice's permitting witness Kenneth Gammon to testify concerning the shotgun; and (5) the trial justice's allowing photographs into evidence.

We have carefully considered defendant's arguments in support of these issues. In some instances we have commented in this opinion on similar arguments raised by defendant's attorneys.

In respect to the defendant's arguments that were not raised by his attorneys, we consider them to be unpersuasive in establishing, in any instance, that either the motion justice or the trial justice committed prejudicial error.

### Conclusion

For the reasons stated, the appeal of the defendant is denied and dismissed. The judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.

Justices GOLDBERG and FLAHERTY did not participate.