STATE

v.

Vincent POPE.

No. 77–449–C.A.

Supreme Court of Rhode Island.

May 9, 1980.

Dennis J. Roberts II, Atty. Gen., Kenneth P. Madden, Sp. Asst. Atty. Gen., for plaintiff.

Mann & Roney, Robert B. Mann, Providence, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, Vincent Pope (Pope), was charged in a multicount information with committing the crimes of assault with intent to rob, assault with a dangerous weap-

on, extortion, and carrying a gun without a license. A Superior Court jury returned guilty verdicts with respect to all four counts. Pope's motion for a new trial was denied. Thereafter, the trial justice imposed a series of concurrent prison sentences. Pope is before us on an appeal in which he raises a multitude of issues, most of which merit little consideration.

At about 5 a. m. on September 5, 1976, a Providence obstetrician, Dr. John Barrall, while dressed in his "scrub suit," had left his East Side home and was driving in a westerly direction on Douglas Avenue, headed toward Women & Infants Hospital where he was to minister to the needs of a patient in labor. As the physician neared an entrance ramp that begins at the easterly curb and leads to the southbound lanes of U.S. Interstate Route 95, he struck the rear of a station wagon that had just turned onto the ramp. When the obstetrician alighted from his vehicle to meet with the occupants of the wagon, he was met by the wagon's driver, who grabbed Dr. Barrall by the throat, demanded $300 as the cost of repairing his car, and repeatedly struck the physician about the side of his head.

Approximately ten minutes later the wagon's passenger, whom the police later identified as Pope, appeared at the doctor's side, put a .22 caliber pistol to the physician's throat, and ordered him to "get the money up." Pope gave additional emphasis to his demand by discharging the firearm into the air. Doctor Barrall then attempted to search the glove compartment of the car but came up with no cash.

The first officer to arrive at the collision scene observed one man running down the entrance ramp and two others, Pope and Dr. Barrall, at the physician's vehicle. This officer testified that he found the pistol stuffed between a seat cushion and the "wall of the rear seat." An examination of the weapon disclosed that it contained five live rounds of ammunition and one empty shell.

Pope conceded that he had carried the pistol on the day in question but denied threatening the obstetrician in any fashion whatsoever. He explained to the jury that in order to avoid being found in possession of the pistol, he had drawn the weapon from his belt; somewhere in the withdrawal process, the gun's hammer was accidentally pulled back. He thereupon fired the weapon and secreted it inside the vehicle. Pope insisted that he had employed this unorthodox method of securing the gun's trigger because his right hand was so badly injured in the collision that it was impossible for him to restore the hammer manually to a closed position.

During its cross-examination of Pope, the state sought to impeach his credibility by having him admit to two prior convictions. One conviction occurred in 1958 and involved an assault with a dangerous weapon. The other conviction occurred in 1968, and it concerned a charge of illegal possession of a pistol. Pope now claims that the trial justice erred in allowing this evidence because not only were the two convictions remote in time, but they were also of the same nature as the offenses for which he was being tried in the winter of 1977.

■■ In this jurisdiction, remoteness is the sole crucial factor to be considered by a trial court when an effort is made to impeach a witness's credibility by evidence of his prior involvement with the law. State v. O'Brien, 412 A.2d 231 (R.I.1980); State v. Bennett, R.I., 405 A.2d 1181 (1979); State v. Lombardi, 113 R.I. 206, 319 A.2d 346 (1974). Remoteness is not, however, measured solely by the passage of time, since a trial court, in the exercise of its discretion, can take into account convictions intervening between the past conviction and the crime for which the defendant is being tried. The factfinder has a right to consider whether one who repeatedly refuses to comply with the law is more likely to ignore the obligation of truthfulness than a law-abiding citizen. See State v. Sands, 76 N.J. 127, 144–145, 386 A.2d 378, 387 (1978).

■ Here, the assault-with-a-dangerous-weapon charge arose nineteen years before the trial. Pope's illegal possession of the gun occurred about nine years before

the trial and about ten years subsequent to the assault conviction. The trial justice reminded the jury that they were to consider the convictions solely for the purpose of impeachment;[1] in light of what we have just said, we cannot fault the trial justice in his refusal to exclude the assault-with-a-dangerous-weapon conviction.

Pope operated a South Providence nightclub. He attempted to excuse his licenseless possession of the pistol by claiming that the weapon provided an extra measure of protection from anyone who might want to rob him of the nightclub's receipts. According to Pope, at the time of the collision he was headed homeward carrying with him some $370 in cash. The cash represented the night's receipts at the club.

In rebuttal the prosecution presented a Providence police officer who worked in the detention area at police headquarters. This officer explained that any new "prisoner" entering the detention area is searched, after which all his belongings are taken from him and placed in a bag containing his name; the bag is then placed in a locker. The witness identified a document as a "lockup sheet." The sheet is dated September 5 and lists the names of eight prisoners. It indicates that Pope occupied "Cell 3," being on "Hold" for the "C Squad," and that his "Traps" consisted of ".71¢." Pope now claims that the trial justice erred when he ruled that the sheet qualified as a business record. The officer testified that he made the entries listed on the sheet as part of his duties, and he also observed that the sheet was kept in the regular course of police business and that the notations occurred simultaneously with the search and seizure.

■ In *State v. Jamgochian*, 109 R.I. 46, 49, 280 A.2d 320, 322 (1971), we once again pointed out that although our business-record legislation, G.L.1956 (1969 Reenactment) § 9–19–13, refers only to "civil proceedings," a record may be admitted into evidence under the common-law exception to the hearsay rule as being an entry made in the regular course of business. In *Jamgochian* we referred to the holding in *State v. Guaraneri*, 59 R.I. 173, 177, 194 A. 589, 591 (1937), which laid down the following common-law requirements: (1) it must appear that there was a duty to keep the record in the regular course of business; (2) the person whose duty it was to keep such a record must, if alive, competent, and within the jurisdiction, testify that the entry was made in the regular course of business in his handwriting or under his immediate supervision. The officer touched all the necessary common-law bases.

In essence, Pope's objections go to the weight to be given to such a document because he points out such factors as the records' being in pencil rather than in ink, and the officer's coming to work at 8 a. m., three hours after Pope's arrest.

■ Pope also argues that the trial justice should have permitted certain defense witnesses to testify as to why he was carrying a pistol on the morning he encountered Dr. Barrall. The trial justice rejected offers of proof indicating that two defense witnesses were prepared to testify that at one time Pope had testified for the prosecution at a murder trial and since that time had been subject to threats, shootings at his nightclub, and other acts of violence against him and his family. These reprisals, according to Pope, would justify his being armed.

---

1. The trial justice's admonition as to the purpose of the evidence of prior convictions came during his charge to the jury. In *State v. O'Brien*, 412 A.2d 231 (R.I. 1980), we once again stressed that at the time the sponsoring party introduces this evidence, the trial court must of its own accord instruct the members of the jury that they must limit their use of this evidence to the assessment of the credibility of the witnesses and that otherwise it has no probative force as proof of any of the elements of the crime charged. Pope now criticizes the trial justice's failure to so charge the jury at the time his past criminal activity was brought to the jury's attention. Pope overlooks the fact that nobody, including his trial counsel, reminded the trial justice of this requirement. While the admonition should be given at the time the evidence is received on this record, we perceive no prejudice to Pope even though the trial justice's comments on the use of Pope's prior convictions were somewhat belated.

The trial justice's rejection of the offers of proof is well warranted. The reasons for the pistol's presence were totally irrelevant. The sole issue on the gun-carrying charge was whether Pope had a license to carry the weapon. His reasons for carrying the pistol were of no concern to the jury. As an aside, the transcript clearly indicates that soon after Pope began his testimony, the jury was made well aware of why he had the gun. He told the jury that his friend had been shot, that a fire bomb had been thrown into his basement, that his guard had been executed, and that various other acts of violence had been committed. Pope claimed that all of these acts were in retribution for his witness-stand appearance. The jury, consequently, was well aware of Pope's reasons for being armed, but it obviously thought that these events were no excuse for his not having a license.

■ As the trial was about to begin, Pope's appointed trial counsel informed the trial justice that Pope had written to the Superior Court's Presiding Justice, asking that he be afforded the services of a new attorney, for he no longer wanted his present counsel "to represent me in this matter or any other matter." Pope addressed the court and faulted his counsel because "there was [sic] things that should have been said that hadn't been said during the bail hearing * * *." The trial justice, in rejecting Pope's request, observed: "Mr. Pope is certainly entitled to effective counsel. He's not privileged to have counsel of his own choice but merely to have effective counsel and a fair trial." The trial justice then commented favorably on the quality of service that Pope had received from his present counsel. Pope now claims that the denial of his request amounts to the denial of his right to obtain counsel of his own choice and points to our holding in *State v. Dias*, 118 R.I. 499, 374 A.2d 1028 (1977), as authority for this proposition.

There is a world of difference between *Dias* and Pope. Dias was insistent upon retaining private counsel but was forced to accept the services of a member of the Public Defender's staff, who, incidentally, objected to being an unwilling last-minute substitute for Dias's private counsel. Pope stands on a different footing. He does not seek the services of private counsel but rather a switch in appointed counsel. His specific choice was a member of the Public Defender's staff. The Public Defender's office was representing the driver of the car involved in the collision with Dr. Barrall, and in fact Pope's present counsel was appointed by the Superior Court to avoid any conflict of interest within the Public Defender's office. We see no validity whatsoever to his claim of denial of his right to counsel of his own choice.

■ Pope's appellate counsel has lodged strenuous objection to a portion of the trial justice's charge wherein he told the jury that it could rely on the pertinent provisions of G.L.1956 (1969 Reenactment) § 11–47–4, which in essence provide that whenever an individual is being tried for committing, or attempting to commit, a crime of violence, the fact that he was armed with a pistol or revolver without a license to carry the same "shall be prima facie evidence of his intention to commit said crime of violence." The argument is made that this statutory inference is totally irrational and thus deprives Pope of his due-process rights. The simple response to this contention is to point out that at trial no objection was made to this portion of the instruction.

In *State v. McGehearty*, R.I., 394 A.2d 1348 (1978), we permitted the defendant to raise the constitutional issue for the first time on appeal and, in doing so, might have left the bar with the impression that we had jettisoned our well-established rules which require the raising of a constitutional issue in the first instance at the trial level and which preclude a challenge to the sufficiency of the charge when a defendant has failed to object to the instruction or to request a different one. Nothing could have been further from our minds. In *McGehearty* it was obvious that at the time the case was tried in the Superior Court, there was some confusion as to the exact impact of the rule in *Mullaney v. Wilbur*,

421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), on Rhode Island's long-standing requirement that intoxication was an affirmative defense.[2] Certainly, there was at the time of Pope's trial no such cloud of uncertainty about what the acceptable procedure was for raising the issue which Pope, at this late date, seeks to bring before us. The constitutional challenge should have been brought by way of an objection to the charge. We see no reason from the record before us to depart from this well-established rule. Thus, he may not challenge the charge at this time. Our refusal to consider this issue is, however, without prejudice to Pope's attempting[3] to raise the issue in some other appropriate proceeding.

Pope also claims that the trial justice erred when, in connection with the charge of carrying a pistol without a license, he refused to charge the jury that a conviction for the possessory offense could not be sustained if the jury believed that at the time of the collision Pope was carrying the nightclub's cash receipts. In taking this position, Pope cites a portion of G.L.1956 (1969 Reenactment) § 11–47–9 (1979 Supp.), which provides that the license requirements "shall not apply to * * * moving goods from one place of abode or business to another." Pope sought to take advantage of the exclusion because, according to him, at the time of the collision he was heading home, carrying "goods," to wit, his nightclub receipts.

Pope's request to the trial justice contained a very selective reading of § 11–47–9. Actually, the "goods" exemption afforded by § 11–47–9 is applicable to"any person while carrying a pistol un-loaded and securely wrapped from the place of purchase to his home or place of business, or in moving goods from one place of abode or business to another." This exemption means that a license is not required if, while one is moving from one place of residence to another place of residence or transferring his business endeavors from one site to another, there is within the "goods" being transported an unloaded, wrapped firearm. The "goods" referred to in the statute are those items of personal property which will be loaded on the mover's van once it arrives at one's front door as a family or individual moves from one address to another address. Here, Pope's pistol was neither unloaded nor securely wrapped, and the cash he supposedly had does not fall within the meaning of the word "goods" as it is used within the context of § 11–47–9.

The final issue to be considered is Pope's contention that his constitutional right to be protected from double jeopardy was violated through the convictions on both extortion and assault with intent to rob. In order to determine whether an accused is threatened by being punished twice for the same offense, this court in *State ex rel. Scott v. Berberian*, 109 R.I. 309, 284 A.2d 590 (1971), adopted the following standard as set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932);

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only

---

**2.** This confusion was shared by many. Some read the case as a condemnation of all affirmative defenses, while others concluded that *Mullaney* invalidated some, but not all, burden-shifting defenses. Jeffries and Stephan, *Defenses, Presumptions, and the Burden of Proof in the Criminal Law*, 88 Yale L.J. 1325, 1340 (1979). The uncertainty was resolved in *Patterson v. New York*, 432 U.S. 197, 214–15, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281, 294–95 (1977), where the Supreme Court, while specifically discrediting the notion that *Mullaney* required the state to prove beyond a reasonable doubt any fact affecting the degree of criminal culpa-bility, held that a state could place the burden of proving an affirmative defense on a defendant so long as that burden did not include negating an element of the crime charged. The author of *Mullaney*, Mr. Justice Powell, in dissenting, characterized the distinction drawn between an "element" and a "defense" as purely "formalistic" and decried the implicit overruling of *Mullaney*. *Id.* at 221–25, 97 S.Ct. at 2332–35, 53 L.Ed.2d at 298–301.

**3.** *See State v. Duggan*, R.I., 414 A.2d 788 (1980).

one, is whether each provision requires proof of a fact which the other does not."

The implementation of this test requires a close examination and comparison of the elements of the offenses in question. Extortion is an offense that entails a "verbal threat to place a victim in peril of actual bodily harm, accompanied by an intent to compel that victim to do an act against his will." *State v. Davis*, R.I., 384 A.2d 1061, 1064 (1978); G.L.1956 (1969 Reenactment) § 11–42–2. As we have defined in *State v. Baker*, 20 R.I. 275, 277, 38 A. 653, 654 (1897), an assault is an "unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness." The unsuccessful objective of the assault in this case is robbery, which is defined as the " 'felonious and forcible taking from the person of another of goods or money to any value by violence or putting him in fear.' " *State v. Reposa*, 99 R.I. 147, 149, 206 A.2d 213, 215 (1965), *citing* 4 Black.Comm. 241.

A compilation of these definitions indicates that in order to prove both extortion and assault with intent to rob in this case, the state had to demonstrate the identical elements of an intentional threat to Dr. Barrall that placed him in fear of actual bodily harm, the purpose of which was to force him to give Pope money. Since proof of no additional fact is required to establish both of these crimes, Pope's conviction for assault with intent to rob and extortion violated his right to be protected from double jeopardy. *State v. Davis*, R.I., 384 A.2d 1061 (1978); *State v. Boudreau*, 113 R.I. 497, 322 A.2d 626 (1974).

Consequently, as a result of our finding of double jeopardy, the trial justice must make a choice. He imposed a fifteen-year sentence on the assault-with-intent-to-rob count with ten years to be served immediately and the execution of the remaining portion of the sentence to be suspended during a five-year probationary period. Pope received a ten-year sentence on the extortion conviction. On remand, it is the trial justice's choice which one of these two counts he will dismiss.

The defendant's appeal is sustained in part and denied in part, the judgment of conviction appealed from is affirmed in part and vacated in part, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.