STATE

v.

Jerry COLEMAN.

No. 2004–97–C.A.

Supreme Court of Rhode Island.

Nov. 22, 2006.

Diane Daigle, Esq., for Plaintiff.

Catherine A. Gibran, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS.

The defendant, Jerry Coleman (defendant), appeals his conviction in the Superior Court for felony conspiracy, breaking and entering a dwelling, felony assault, and driving a motor vehicle without the consent of the owner. All charges stemmed from one particularly troubling incident that took place in Warwick in early July 2001, perpetrated with the assistance of one Jeffrey Alston a/k/a Kam Ausar.[1] For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

At approximately 9:30 p.m. on July 3, 2001, Dennis and Suzanne Laven (Dennis and Suzanne, respectively) returned to their Warwick home after an evening of shopping. Immediately they became unnerved by the presence of an unfamiliar vehicle parked on the street near the front of their house. Their suspicions of malfeasance were confirmed when they noticed a front door ajar and Dennis spotted a light on in the house.

According to Dennis, he instructed Suzanne to phone the police as he exited their vehicle, and he made his way up the front steps toward the open door. Suzanne testified that, as Dennis approached the door, he yelled something like, "Get out of the house, we're home." Dennis explained that he observed two men leaving his home through a sliding glass door leading to the backyard. Dennis gave chase around the attached garage, but rather than follow the two men into the dense thicket that bordered the Lavens' yard, he ran to the suspicious vehicle parked near the front of his home and removed the keys from the ignition. With keys in hand, he ran to the middle of the street and waited for the two men to return for their vehicle. Suzanne later

1. In a severed trial in the Superior Court, Jeffrey Alston a/k/a Kam Ausar was convicted of felony conspiracy, breaking and entering a dwelling, and felony assault. This Court vacated his conviction and ordered a new trial in *State v. Alston*, 900 A.2d 1212 (R.I.2006).

On November 2, 2005, this Court issued an order granting Jeffrey Alston's motion to amend the record to reflect his change of name to Kam Ausar. For the sake of clarity, however, in this opinion we will refer to Mr. Ausar as Jeffrey Alston.

joined her husband at the bottom of the driveway with the portable house telephone in hand, and they waited there.

As anticipated, the two men—according to Dennis, one noticeably taller than the other—emerged from the woods shortly thereafter and approached the suspicious vehicle. Dennis told the men that the police were on their way and that he had the keys to their car. After confirming that the keys were, in fact, not in the ignition, the larger of the two men charged the homeowner, claiming that he had a knife and was going to cut Dennis open. Dennis threw the keys into the woods and prepared himself for the imminent altercation; a street fight ensued. During the struggle, the smaller man approached Dennis from behind and struck him on the head, sending Dennis to the ground, where he landed on his head. Dennis testified that both men began kicking him repeatedly. Not to be subdued so easily, however, Dennis managed to rise to resume fending off his attackers.

According to Dennis, the smaller man then turned his attention to starting the suspicious vehicle. Soon after, the larger man rather suddenly ceased his assault and joined the smaller man at the car. Dennis testified that, almost as suddenly, the taller man again approached Dennis, announcing this time that he had a gun and was going to shoot him; instead, the two men engaged in another quick bout of fisticuffs.

According to Dennis, the taller man then switched his attention to Suzanne. He advanced on her, telling her that he was going to shoot her. In response, Suzanne surrendered a set of keys and the telephone she had used to dial the police. The taller man threw the telephone to the ground and returned to the suspicious vehicle with the keys. Unbeknownst to the assailant, however, Suzanne had given him

the keys to the *Lavens'* car. When the keys predictably failed to start their car and the headlamps from a neighbor's car illuminated the scene, both men quickly retreated into the woods. Dennis testified that, just minutes after the two men escaped into the woods behind his home, two police cruisers and a first-aid vehicle arrived; the vehicle took him to Kent County Memorial Hospital, where he remained for approximately six hours. Dennis testified that he was treated for various lacerations to his head and body, a bleeding nose, and injuries to his wrist and thumb. While at the hospital, Dennis dictated a statement to Suzanne, who transcribed it on his behalf. Suzanne provided the police with this statement as well as a separate written statement of her own summarizing the evening's events.

Dennis and Suzanne were unable to identify their attackers despite at least two photo lineups. However, they were able to supply the Warwick police with general descriptions of the two men. Although neither Dennis nor Suzanne could pinpoint the race of either perpetrator, both agreed the men had dark skin. And while the time of night, the heft of the attacker's clothes, and the topography of the Lavens' yard made it difficult for either Dennis or Suzanne to estimate their attackers' heights, both homeowners agreed that the taller of the two men was between five-eleven and six-three, and the shorter man was between five-eight and five-ten.

According to Det. Eric Johnson (Det.Johnson), his suspicion of defendant initially was spurred, in part, by listening to tape-recorded telephone conversations obtained from Special Investigator Joe Forge at the Adult Correctional Institutions (ACI). Each of these telephone calls was placed between July 3 and July 4, 2001, by Charles Sims (Sims), an inmate at the ACI and, according to defendant, an

old friend of defendant's. By listening to the content of those conversations, Det. Johnson deduced that defendant was somehow involved in the July 3 housebreak in Warwick.

Detective Johnson began building a case against defendant. First, Det. Johnson discovered that, in the days leading up to the July 3 housebreak, three calls were placed from Jeffrey Alston's cell phone to defendant's wife's residence. In addition, a latent palm print lifted from the hood of the suspicious vehicle left in front of the Lavens' house was a match to defendant's known print. Finally, Det. Johnson learned from Belinda Robinson, Sims's love interest at the time of the offense, that she had observed cuts and scrapes on defendant's arms shortly after the July 3 housebreak—wounds that defendant explained he had incurred while running through the woods.

The defendant was arrested on February 14, 2002, and interviewed by Det. Johnson at the Providence police station the following morning. Detective Johnson testified that he verbally advised defendant of his *Miranda*[2] rights and then gave defendant a rights form. Detective Johnson looked on as defendant checked the box indicating he understood his rights

and signed the form. According to Det. Johnson, defendant then began to talk. At first, defendant implicated only Jeffrey Alston in the July 3 housebreak; eventually, however, defendant placed himself at the scene of the crime, and then fully confessed his involvement in the offense. The defendant finally reduced his confession to writing, which conspicuously contained no mention of Jeffrey Alston.[3] Detective Johnson testified that, during the three to four hour interview, he furnished defendant with beverages, allowed him to use the restroom, and even afforded him a cigarette break. On cross-examination, Det. Johnson acknowledged that defendant was handcuffed to a table when the detective first encountered defendant at the Providence police station.

The defendant and Jeffrey Alston subsequently were charged by criminal information with conspiracy to break and enter a dwelling in violation of G.L.1956 § 11–1–6, breaking and entering a dwelling in violation of G.L.1956 § 11–8–2, assault with a dangerous weapon in violation of G.L.1956 § 11–5–2, assault and battery resulting in serious bodily injury in violation of § 11–5–2, and driving a motor vehicle without the consent of the owner in violation of G.L.1956 § 31–9–1 and G.L.1956 § 31–27–

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** The defendant's confession is as follows:

"I, Jerry Coleman, on or about July, did break into a house in Warwick, R.I. Upon entering the house, the front door was open. I went inside. People returned home, a man and women [*sic*]. At this point, I became afraid and went out the back door and down the driveway. Went to car. Noticed keys were missing. Then two people came to car and question as to what was happening. Notice they had the keys. At this point I became physically violent with the two people, because I could not find the keys to the car. So I ran on foot into some wood [*sic*], until I was clear

out of sight, and then proceeded to make my way back to Providence, not before taking a car somewhere in Warwick. I'm not sure where in Warwick I gotten the car, but drove it to Rt. 10. I then went home 34 Alexander Street. I had a call from the prison as to what had taken place the night before. The discussion went, as followed [*sic*]. 'Are you okay?' I said, 'yes.' This phone call was between [eight] a.m. and [eleven] a.m. from Priscilla Sims, who told me that her brother Charlie Sims was on the phone and wanted to talk to me about the night before, what was on the news about a break—'housebreak'—in Warwick, R.I. What I can recall was the concern about my being ok."

9. On June 18, 2003, defendant's criminal trial began.[4]

At trial, various witnesses testified as to the aforementioned facts, including the state's witness Sims, who had been granted immunity in exchange for his testimony against defendant. In addition, defendant took the stand in his own defense. Although defendant admitted that he was friendly with Jeffrey Alston—his alleged coconspirator in the housebreak—he maintained that he was nowhere near the Lavens' Warwick residence on July 3, 2001. Instead, defendant testified that he was conducting a narcotics transaction on behalf of Sims in South Providence, where he was involved in an altercation. He claimed that he was able to escape to another location in South Providence. The defendant further explained that the telephone calls he received from Sims and Robinson were in connection with the botched drug transaction. With regard to defendant's custodial statements to Det. Johnson, defendant testified that he confessed to the crime out of desperation, noting that the police would not let him take medication for a leg injury and that he was left handcuffed to a table for hours.

On July 1, 2003, the jury returned its verdict. The defendant was found guilty of felony conspiracy, breaking and entering, and driving a motor vehicle without consent of the owner. The defendant also was found guilty of the lesser included offense of simple assault for both assault-related charges. At a hearing on defendant's motion for a new trial, the trial

justice concluded that the two simple assault convictions merged into one. The defendant subsequently was sentenced to an aggregate of twenty years to serve.[5] The defendant timely filed a notice of appeal to this Court.

Additional facts will be provided as necessary.

## II

## Analysis

On appeal, defendant alleges three errors. First, he argues that the trial justice's refusal to grant his motion to pass the case constituted reversible error. Second, defendant contends that the trial justice erred in giving the jury an improper instruction regarding the voluntariness of defendant's custodial statement. Finally, defendant maintains that the trial justice abused her discretion by allowing into evidence two prior felony convictions to impeach defendant's credibility. We address each issue in turn.

### A

**Denial of Motion to Pass the Case**

The defendant first maintains that the trial justice committed clear error by refusing to grant his motion to pass the case immediately following a prejudicial comment by the state's immunized witness, Sims.

Just after Sims took the stand at defendant's trial, the state inquired how Sims

---

4. Prior to trial, Jeffrey Alston filed a motion to sever his case from defendant's, citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This motion was granted.

5. The defendant was sentenced as follows: ten years for felony conspiracy with five years to serve and five years suspended with probation; fifteen years for breaking and entering a

dwelling with twelve-and-a-half years to serve and two-and-a-half years suspended with probation; one year to serve for simple assault; and five years for driving a motor vehicle without the consent of the owner with one-and-a-half years to serve with three-and-a-half years suspended with probation. All sentences were to run consecutively.

knew defendant, to which Sims replied, "Well, through being in jail, you know, since we was kids." The defendant immediately moved to strike the answer and requested a bench conference, which the trial justice granted and excused the jury. At the bench conference, defendant made a motion to pass the case, citing Sims's inflammatory answer, and noted that a cautionary instruction would only ring the prejudicial bell a second time, further impressing upon the jurors' minds the taint of Sims's offending statement. The state, predictably, argued that a simple cautionary instruction would suffice to cure any prejudice suffered by defendant. Outside the presence of the jury, the trial justice announced to the attorneys for the state and defendant the following plan:

> "I am going to * * * ask the jury if they can assure the court that they are able to disregard that statement, not speculate about it, and consider the evidence in this case, and this case alone. And then, if they all seem to indicate to me that they can do so, I will go into chambers with the attorneys and the court reporter and individually voir dire each and every one of them to make sure

they can. I will allow the attorneys to question the jurors, if you feel that you want to do so, on this very point. Depending on their responses, I will either deny the motion or grant the motion."

When the jury was brought back into the courtroom, the trial justice struck Sims's answer, and ordered the jury to disregard the offending comment and not to speculate about its meaning. In addition, she asked the panel whether they were capable of doing just that, to which she received a unanimous affirmation.[6] The trial justice then sent all the jurors but one from the courtroom, and proceeded to voir dire the remaining juror to ensure her ability to disregard Sims's response and not to speculate as to its meaning. At the conclusion of the voir dire of the first juror, defendant—after first reasserting his motion to pass the case—moved to discontinue the individual voir dire, citing his fear that the practice would only serve to draw additional attention to Sims's comment. The trial justice granted defendant's motion to discontinue the individual voir dire, and she denied defendant's motion to pass the case.

6. The trial justice issued the following cautionary instruction to the jury, in pertinent part:

> "Ladies and gentlemen, the witness, who appeared here a few minutes ago, Mr. Sims, was asked a question * * * how he knew [defendant]; specifically, I believe he was asked, 'How do you know him?'
>
> "And it appears his response was, 'Well, through being in jail, you know, since we was kids.'
>
> "Ladies and gentlemen, I honestly don't know what that response means, implies, or suggests. I do know that I'm striking the response and ordering you to disregard it. It has nothing, whatsoever, to do with the issues in this case; all right?
>
> "I further instruct you that, in determining the facts of this case, you can't speculate as to the meaning of that statement, nor can you give it any weight. The state in

this case is charged with the burden of proving this defendant guilty of these crimes charged by proof beyond a reasonable doubt. Those are issues, and those are the only issues you are to consider. In other words, what Mr. Sims said, suggested, or implied, if at all, he did.

> "I'll be honest with you, I don't quite know what he meant. It has nothing to do with this case, and I don't want you to consider it or give it any weight in determining whether the defendant committed the crimes charged.
>
> "I'm going to ask you to search your hearts, your conscience, and give me an honest, complete, and truthful answer. Can you disregard that statement, not speculate about it, and consider the issues in this case based upon the evidence presented in this case?
>
> "Can you do that?"

On appeal, defendant argues that the trial justice's cautionary instruction was insufficient to purge the taint of Sims's reply and that the trial justice should have granted his motion to pass the case.

"A decision about whether a trial justice should pass the case and declare a mistrial rests in his or her sound discretion." *State v. Briggs*, 886 A.2d 735, 760 (R.I.2005). "The reason we vouchsafe such broad power in the trial justice in this regard is 'that he or she possesses a "front-row seat" at the trial and can best determine the effect of the improvident remarks upon the jury.' " *State v. Mendoza*, 889 A.2d 153, 158 (R.I.2005) (quoting *State v. Oliveira*, 774 A.2d 893, 912 (R.I. 2001)). As such, a trial justice's ruling on a motion to pass the case "is entitled to great weight and will not be disturbed on appeal unless the trial justice is clearly wrong." *Id.* (quoting *State v. Shinn*, 786 A.2d 1069, 1072 (R.I.2002)).

"If a defendant objects to a remark as prejudicial the trial justice must determine the potential prejudice that the statement might have on the outcome of the case by examining the statement in its full factual context." *State v. Brown*, 528 A.2d 1098, 1103 (R.I.1987). In such a case, this Court has stated that "the trial justice has a duty, if at all possible, to attempt to 'free the evidence from such [harmfulness] * * * with [a] proper warning to the jury.' " *Id.* (quoting *State v. Peters*, 82 R.I.

292, 297, 107 A.2d 428, 430–31 (1954)). If the trial justice chooses to issue a cautionary instruction, the question before us on appeal is whether his or her instruction " 'can be fairly said to have removed from [the jurors' minds], when weighing the evidence properly before them, the taint represented by the enveloping smoke of a criminal record.' " *Id.* We also are guided by the oft-cited principle that " '[i]n the absence of any indication that the jury was not capable of complying with the trial justice's cautionary instruction this Court must assume that the jury did disregard the witness comments as it was instructed to do.' " *State v. Disla*, 874 A.2d 190, 198 (R.I.2005).

This case closely resembles the factual scenario in *State v. Werner*, 831 A.2d 183, 207 (R.I.2003), in which a state's witness inadvertently testified that she was living with the defendant's sister "while defendant was in jail." Much like the case at bar, the trial justice in Werner issued a cautionary instruction to the jury, which this Court held "was sufficient to dispel any potentially inflammatory effect [the comment had] upon the jurors."[7] *Id.* at 208.

It is uncontested that Sims's response to the state's query was improper. Yet we are satisfied that the trial justice's cautionary instruction in the present case sufficiently palliated whatever harmful effect Sims's response may have had on the

---

**7.** The trial justice's cautionary instruction in *State v. Werner*, 831 A.2d 183 (R.I.2003), was as follows:

"All right, ladies and gentlemen, you just heard [the witness] make an answer that she opened this particular box when she was living with the defendant's sister and he was in jail.

"Now, that's an improper reference because it may lead you to believe that because he's in jail he may have done something else untoward or other. I don't know

if he was in jail. If he was in jail, it's none of our concern whatsoever. You are to judge this case on its merits or lack of its merits according to the instructions that I give you. So I'm going to instruct you now to disregard any notion that this defendant may or may not have been in jail, what he may have been in there for, just put it out of your mind. It has absolutely no bearing on the guilt or innocence of this defendant in this case." *Id.* at 207.

jury. Not only did the trial justice conspicuously note the irrelevance and impropriety of Sims's comment, but also she took the extraordinary step of ensuring that the entire jury was capable of disregarding the witness's response and not speculating about its meaning. Without any evidence to the contrary, this Court is constrained to conclude that the jury was, in fact, capable of heeding the trial justice's admonition, especially in light of the relative strength of the state's case against defendant. *See Brown,* 528 A.2d at 1103. Given the additional fact that defendant actually took the stand and admitted having served time in prison before, we hold that the trial justice did not abuse her discretion in refusing to grant defendant's motion to pass the case.

## B

### Voluntariness Instruction

The defendant next argues that the trial justice gave an improper reinstruction to the jury regarding the voluntariness of defendant's statements while in custody at the Providence police station.

It is worth recounting that defendant's verbal statements to Det. Johnson, as well as defendant's written confession, all uttered while in custody at the Providence police station, comprised a large part of the state's case against defendant. The defendant, however, never challenged the voluntariness of these statements in a pretrial motion to suppress, nor did he contest the admissibility of the statements at trial. The written statement was admitted into evidence and published to the jury and Det. Johnson was permitted to testify as to defendant's oral confession. Nevertheless, the trial justice gave a voluntariness instruction in her charge to the jury;[8] in fact, the state had requested such an instruction in its request to charge.

In the morning of the second day of deliberations, the jury presented a single question to the trial justice: "Does being handcuffed constitute constrained?" The trial justice answered as follows:

"Well, the easy answer: Does 'handcuff' mean you're restrained or constrained? Well, sure; sure, it does. But, the question here is in the context of whether or not a statement, admission, or confession is voluntarily given does constrain mean being handcuffed?

" * * *

8. The trial justice's voluntariness instruction was, in pertinent part, as follows:

"Various statements purporting to be those of the defendant have been admitted into evidence. Included among those statements were alleged oral statements given to the Warwick Police, as well as an alleged written statement given to the Warwick Police. I will instruct you on those statements.

"Statements given to law enforcement officers can only be considered by you if you first find that the state has proven to you, by clear and convincing evidence, that the statements were not given until the defendant was advised of his constitutional rights, that he voluntarily, knowingly, and intelligently waived those constitutional rights; and that the statements were voluntarily made. In order to make this determination, it is necessary that you understand what is meant when certain words or phrases are used in the legal sense.

" * * *

"Secondly, 'voluntarily' has been defined as not constrained, impelled, or influenced by another, intentional, done of one's own free will, without threats, promises, or coercion.

" * * *

"Fourth, the state must prove to you that the defendant was advised of his rights; that he voluntarily, knowingly, and intelligently waived them; and the statements were made voluntarily, by clear and convincing evidence. In other words, unless you find, by clear and convincing evidence, that the state has proven these things, you cannot consider those statements."

"To answer the specific question: No, being handcuffed, in and of itself, does not preclude one from giving a statement voluntarily. The question is not whether or not a person giving the statement is free to leave the room or even free to get up and roam around the room. The question is whether he freely gave the statement or statements, whether he did so while restrained with handcuffs or not. When he spoke, when he wrote, was he compelled to do so by threat or coercion? Or, when he spoke and when he wrote, did he do so as his own free act and deed?

"So, the question you need to consider is not whether he was handcuffed when he gave his statement, but whether, when he spoke or wrote his statement or statements, he did so without threat, promises, or coercion. In other words, that he made the statement or statements as his own free act and of his own free will.

" * * *

"I do want to just reiterate to you, when you determine whether a statement is voluntarily given, you consider all of the evidence, every factor; but what you're trying to determine here, what you're trying to get at by considering all of the evidence, all of the circumstances and facts, is whether or not, when he spoke or wrote, he did so without promises or coercion. Did he do it of his own free act and deed?"

The defendant immediately took exception with the trial justice's reinstruction, arguing that the trial justice failed to adequately impress upon the jury that the fact of being handcuffed to a table was a legitimate consideration when determining the voluntariness of defendant's statements. The trial justice noted defendant's exception, but sent the jury back without incorporating defendant's proposed corrections. The defendant's only argument on appeal is that the trial justice's reinstruction constituted reversible error.[9]

■ When this Court reviews jury instructions, we will "'examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them,' * * * and we review challenged portions of jury instructions in the context in which they were rendered." *State v. John*, 881 A.2d 920, 929 (R.I.2005) (quoting *State v. Hurteau*, 810 A.2d 222, 225 (R.I. 2002)). In other words, "we look to the charge as a whole, and do not examine a single portion in isolation." *State v. Aponte*, 800 A.2d 420, 428 (R.I.2002).

■ When administering a jury instruction, a trial justice is duty bound to ensure that the jury charge "sufficiently addresses the requested instructions and correctly states the applicable law." *Id.* at 427 (quoting *State v. Mastracchio*, 546 A.2d 165, 173 (R.I.1988)). "[S]upplemental charges, like original charges, must be scrupulously fair to the defendant and to the state and must not infringe upon the factfinding province of the jury by coercion or improper suggestion." *State v. Souza*, 425 A.2d 893, 900 (R.I.1981). Furthermore, when issuing a supplemental instruction, "there [is] no necessity for the trial justice to repeat that portion of the principal charge * * *; his [or her] only responsibility in response to the requirements of due process [is] to answer the

9. In his brief to this Court, defendant explicitly indicates that he does not dispute the admissibility of his custodial statements at trial or the trial justice's initial voluntariness instruction. The defendant insists that the only issue he raises on appeal is the propriety of the trial justice's supplemental instruction.

jury's specific questions." *State v. Giordano,* 413 A.2d 93, 94 (R.I.1980).

 "Statements are voluntary when they are 'the product of [a] free and rational choice.'" *State v. Leuthavone,* 640 A.2d 515, 518 (R.I.1994) (quoting *State v. Amado,* 424 A.2d 1057, 1062 (R.I.1981)). Most important for the purposes of this discussion is the principle that "[t]he definitive test of the voluntariness of a statement is whether, after taking into consideration the totality of the circumstances, it was the product of the defendant's free will or was instead the result of coercion that overcame the defendant's free will at the time that it was made." *State v. Perez,* 882 A.2d 574, 589 (R.I.2005); *accord Leuthavone,* 640 A.2d at 518 ("'all facts and circumstances surrounding the [statement] must be taken into account in determining whether, overall, [it] was freely and voluntarily made'").

 The defendant argues that the trial justice's charge was improper because it instructed "that the handcuffing was really of no consequence." Apparently, defendant narrowly focuses on the trial justice's instruction that "the question you need to consider is not whether he was handcuffed when he gave his statement, but whether * * * he spoke or wrote his statement * * * without threat, promises, or coercion." However, we cannot agree that this statement represents the sort of legal conclusion defendant suggests. Quite the contrary, the trial justice clearly was conveying to the jury that the fact of handcuffing alone does not render a custodial statement involuntary *per se.* Furthermore, the trial justice concluded her supplemental charge with the following: "[W]hen you determine whether a statement is voluntarily given, you consider all of the evidence, every factor." Our review of the charge in its entirety—including the initial charge to the jury—reveals that the trial

justice took care to accurately convey to the jury that the voluntariness of defendant's statements must be determined by considering the *totality* of the circumstances. Therefore, we conclude that the supplemental jury instruction did not constitute reversible error.

### C

### Impeachment with Prior Convictions

Finally, defendant argues that the trial justice abused her discretion by permitting the state to impeach his trial testimony with two prior convictions, claiming first that the convictions were too remote in time to be admissible, and second that the resulting prejudice substantially outweighed the probative value of the convictions.

On April 10, 1984, defendant pled *nolo contendere* to companion charges of larceny and second-degree sexual assault. He was sentenced to fifteen years at the ACI with seven years to serve and eight years suspended with probation. The defendant subsequently was adjudged a violator of his probation for those convictions on January 8, 1992, and the suspension of the remaining eight years was removed.

Before defendant took the stand in his own defense, the trial justice ruled that the state was permitted to impeach defendant's credibility with evidence of the two 1984 convictions, pursuant to Rule 609 of the Rhode Island Rules of Evidence:

> "The ten years will begin to run on the date that the defendant was last confined for the crime of which he was convicted. So, for example, if the defendant was convicted in @92, and was given a two-year suspended sentence, two years probation, and at the expiration of the two years * * * he was declared a violator * * * the ten years begins to run after the expiration of that

confinement. * * * [I]f someone violates the terms of his or her release, any portion of a suspended sentence is revoked, and he is confined, then, under my interpretation and exercising my discretion, it seems to me that it is fair game for cross-examination on the issue of credibility.

" * * *

"I do not think that the similarity between the two crimes is such that the probative value in attacking credibility is substantially outweighed by the prejudice."

The defendant objected to the trial justice's ruling, arguing that because his initial incarceration for those convictions had ended more than ten years prior, they were too remote. Essentially, defendant argued that his return to prison once adjudged a probation violator did not reset the ten-year clock, thereby allowing the state to use the convictions to impeach his credibility at trial. Immediately after the state impeached defendant with these convictions, the trial justice issued a *sua sponte* cautionary instruction to the jury.[10]

■■■ "This Court will not disturb a trial justice's finding regarding the admissibility of prior conviction evidence for impeachment purposes unless * * * review of the record reveals an abuse of discretion on the part of the trial justice." *State v. Morel*, 676 A.2d 1347, 1357 (R.I.1996).

The adoption of the Rhode Island Rules of Evidence in 1987 cast "in a new light" the preexisting statutory right to impeach the credibility of a trial witness with evidence of prior convictions, found in G.L. 1956 § 9–17–15. *State v. Maxie*, 554 A.2d 1028, 1031–32 (R.I.1989); *see also State v. Mattatall*, 603 A.2d 1098, 1117 (R.I.1992). Although Rule 609(a) generally provides for the admissibility of virtually any prior criminal conviction, Rule 609(b) tempers this broad allowance by bestowing upon the trial justice a level of discretion:

"Evidence of a conviction under this rule is not admissible *if the court determines that its prejudicial effect substantially outweighs the probative value of the conviction.* If more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, or if the conviction is for a misdemeanor not involving dishonesty or false statement, the proponent of such evidence shall make an offer of proof out of the hearing of the jury so that the adverse party shall have a fair opportunity to contest the use of such evidence." (Emphasis added.)

■■■ As we have explained previously, the genesis of Rule 609(b) was a desire to maintain conformity with existing Rhode Island case law, which had held that "remoteness of a prior conviction is not measured solely by the passage of time." *Mat-*

---

10. The trial justice gave the following cautionary instruction:

"And we are going to move on, I want to remind everybody of this, okay? You heard evidence on direct examination, and now on cross-examination, that the defendant has a past criminal record of convictions.

"Now, regarding criminal convictions, under Rhode Island law, the fact that a person has been previously convicted of one or more criminal offenses is allowed into evidence; and it probably can be consid-

ered by the jury, if the jury wishes to consider it, but only to assess the credibility of the witness, and the weight you will give to his testimony. It may be considered by you as a factor that you can weigh, along with other factors, in determining the weight you might decide to give testimony of this witness.

"I must emphasize to you that a prior criminal conviction may be used by you only in considering credibility, and for no other purpose."

*tatall,* 603 A.2d at 1117 (citing *State v. Pope,* 414 A.2d 781, 784 (R.I.1980)). Instead, a trial justice "must balance the remoteness of the conviction, the nature of the crime, and the defendant's disdain for the law as represented by the extent of his prior criminal record, to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant." *Id.* Of course, the fact that a prior criminal conviction is more than ten years old only entitles a defendant to a hearing before the trial justice at which he may argue the inadmissibility of that conviction; Rhode Island law recognizes no *per se* disqualification of a prior criminal conviction solely due to temporal remoteness. *See Mattatall,* 603 A.2d at 1117.

Even if this Court were to conclude that defendant's convictions did not constitute "confinement imposed for that conviction" under Rule 609(b), defendant would be entitled only to "a fair opportunity to contest the use of such evidence." *Id.* Because the trial justice did, in fact, afford defendant such a hearing, the only issue before this Court is whether the trial justice abused her discretion in allowing the convictions into evidence.[11]

■ We perceive no error in the trial justice's ruling in this case. First, the defendant has amassed several convictions over the years, thereby making even remote convictions relevant to witness credibility. *See Mattatall,* 603 A.2d at 1117. In addition, we are convinced that the trial justice clearly was wary of the potential prejudice inherent in the use of prior convictions as impeachment evidence, as she excluded from evidence a felony breaking and entering conviction because of the likelihood the jury would consider it improperly as propensity evidence. Finally, the trial justice issued a cautionary instruction to the jury immediately after the state's impeachment of the defendant with these crimes. Given the foregoing, we cannot say that the trial justice abused her discretion by admitting the defendant's 1984 convictions.

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

---

11. Although we need not pass upon whether incarceration because of the removal of a suspended sentence causes a conviction to fall within the ten-year provision of Rule 609(b) of the Rhode Island Rules of Evidence, we note that the majority view would permit such a conviction to fall within the ten-year window. *See, e.g., United States v. Gray,* 852 F.2d 136, 139 (4th Cir.1988); *Commonwealth v. Jackson,* 526 Pa. 294, 585 A.2d 1001, 1002–03 (1991); *State v. O'Dell,* 70 Wash.App. 560, 854 P.2d 1096, 1098 n. 5 (1993).